THE ALBANY FIRE INSURANCE COMPANY *vs.* BAY and others.

By the common law a married woman could not convey her lands by deed, either with or without the concurrence of her husband.

But by the usages and laws of the colony and state of New-York, a married woman may convey her lands, or any interest she may have in lands, by deed duly acknowledged; and such conveyance is valid *although her husband do not join therein.* PRATT, J. and BRONSON, Ch. J. dissenting.

By the common law, the only mode in which a married woman could alienate her lands was by fine or recovery.

*In equity* a married woman is regarded as a feme sole in respect to her *separate estate,* and she may dispose of such estate, it seems, without the solemnity of an acknowledgment or private examination. Such disposition is in the nature of an appointment.

But a wife's *separate estate* is an equitable estate merely, and where the legal title is vested in some other person for her benefit, to the exclusion of her husband.

The legal estate which a wife has in reversion in lands, where the husband has disposed of his life estate as tenant by the curtesy to a third person, is not *separate estate.*

Where there is a mere power to *sell* lands, a power to mortgage will not be implied

Whether a trustee appointed by will, with power to sell and dispose of lands in fee simple *or otherwise,* may mortgage the lands, *quere.*

VOL. IV. 2

[10] THE bill in this cause was filed for the foreclosure of two mortgages executed to the plaintiffs by Gertrude Treat, wife of Richard S. Treat, Samuel S. Lush and John W. Bay, trustees of said Gertrude, and Eliza Bay, wife of the said John W. Bay, as collateral security for the payment of two bonds, also executed by the same persons, one conditioned for the payment of $8000 with interest, and bearing date the 9th day of April, 1830, and the other conditioned for the payment of $1500 with interest, and bearing date the 22d day of November, 1832. The mortgages covered three lots of land situate in the city of Albany, and marked on the map in the case as Nos. 1, 2, 3. In respect to lot No. 2, no question was made. As to lots Nos. 1 and 3, it was insisted in behalf of the defendants, that as Gertrude Treat was a *feme covert* at the time she executed the bonds and mortgages, and as her husband Richard S. Treat did not join with her in the execution, they were void as to her. And it was also contended that the trustees of Mrs. Treat had no power as such to mortgage either of these lots; or at most, only lot No. 1, during the life of R. S. Treat, who died in 1837.

Lot No. 1 was owned by Mrs. Treat in fee at the time of her marriage. She inherited the lot from her mother, and her estate in it had not been changed at the time the mortgages were executed, except that her husband became entitled to a life estate as tenant by the curtesy. His life estate, before the mortgages were given, had been sold under a judgment against him to Doct. Samuel Stringer, who by his will devised it to the trustees before mentioned, upon trust to pay the rents and profits to Mrs. Treat, to her sole and separate use. The title to lot No. 3 was in the same trustees, for the benefit of Mrs. Treat under and by virtue of the will of Doct. Stringer, a codicil to which authorized them to sell and dispose of the lot in fee simple *or otherwise*, as Mrs. Treat should desire. It was insisted on the part of the defendants, that the codicil did not authorize the trustees to execute the mortgages in question.

The supreme court sitting in the third district granted the usual decree of foreclosure and for the sale of the mortgaged premises respectively. (*See* 4 *Barb. S. C. Rep.* 407.) The de-

fendants appealed to this court, where the main question was [11] whether the mortgages were valid liens against Mrs. Treat upon her estate in lot No. 1.

*D. McMartin,* for appellants.

*P. Gansevoort,* for respondents.

JEWETT, J. It is obvious that on the death of Richard S. Treat, all the interest or estate which either the trustees or Mrs. Treat acquired, under the will of Doctor Stringer, in or to lot No. 1, terminated ; and unless the mortgages were so executed as to constitute them valid liens as against Mrs. Treat upon her reversion, the lien created by the mortgages also ceased on the death of her husband. The counsel for the respondent contends that Mrs. Treat was vested with a *separate estate* in lot No. 1, independent of her husband, derived under the will of Stringer, and that as to that she is to be considered as a *feme sole ;* and therefore having executed the mortgages without any fraud having been practised upon her, they are valid in equity.

Conceding that a *feme covert* is to be regarded in equity as a *feme sole,* in respect to her power over her *separate estate,* that can not aid the plaintiff; for as I understand the rule, Mrs. Treat had no *separate estate* in the *reversion* after the termination of her husband's life estate. It was said by the supreme court, that a *separate estate* in the wife exists, where the husband has no interest in or control over it, and where it is not liable to the payment of his debts. That such is the consequence in respect to the separate estate of a *feme covert,* is doubtless true ; but it is not because the entire interest in an estate is vested in a *feme covert* that renders it of the description of a separate estate in her. A *separate estate* in a *feme covert* only exists in such property, whether it be real or personal, as is settled upon her for her separate use, without any control over it on the part of her husband. It is not all the estate, either in lands or chattels belonging to a *feme covert,* nor is it her right of dower in the real estate of her husband. As to that kind of

[12] estate, the court of chancery, for certain purposes, considers her as a *feme sole ;* and her contracts relative to it, if made in a particular manner, as binding. (*Butler* v. *Buckingham*, 5 *Day*, 497 ; *Methodist Episcopal Church* v. *Jaques*, 3 *John. Ch.* 77 ; *S. C. in error*, 17 *John.* 548 ; *Martin* v. *Dwelly*, 6 *Wend.* 13 ; *Murray* v. *Barlee*, 4 *Simons*, 82 ; 2 *Story's Eq.* §§ 1380, 1386.)

It remains then to consider whether these mortgages, executed by Mrs. Treat, are valid liens upon lot No. 1, her husband not having united with her in them. It is certified by the judge who took the acknowledgment of the execution of the mortgages, that Mrs. Treat being examined by him privately and apart from her husband, acknowledged that she executed the same freely and without any fear or compulsion of her said husband. That is the usual and proper form of the certificate of the acknowledgment of the execution of a deed by a married woman. (*Merriam* v. *Harsen*, 2 *Barb. Ch. Rep.* 269 ; 1 *R. S.* 758, §§ 9, 10.)

By the common law, a married woman is disabled from alienating her lands by *deed*, either by uniting with her husband, or by executing it alone. The only mode in which she had power to transfer her title or interest in real estate, was by levying a fine or suffering a common recovery, her deed being void. (1 *Bl. Com.* 444 ; 4 *Cruise's Dig. tit.* 32 *Deed*, ch. 11, § 29 ; *Compton* v. *Collinson*, 1 *H. Bl. Rep.* 345 ; *Jackson* v. *Vanderheyden*, 17 *John.* 167 ; *Martin* v. *Dwelly*, 6 *Wend.* 9 ; *Bool* v. *Mix*, 17 *id.* 128 ; 2 *Kent's Com.* 150, 1 ; *Gillet* v. *Stanley*, 1 *Hill*, 121 ; 5 *Cruise's Dig. tit.* 35 *Fine*, ch. 10, § 5. · *Constantine* v. *Van Winkle*, 2 *Hill*, 240.) The husband, as a general rule, was required to be a party with the wife in levying a fine for the conveyance of her lands ; but she might, as a *feme sole*, levy a fine of her lands without her husband, and it would be valid and effectual as against her and her heirs, unless it should be avoided by the husband during the coverture, which he might do for the benefit of the wife as well as of himself. (1 *Preston on Abst.* 336 ; *Com. Dig. tit. Baron and Feme*, *G.* 88 ; *Mary Portington's case*, 10 *Coke*, 43, *p.* 322.) Lord Loughborough, in *Comp-*

*ton* v. *Collinson*, (*supra*,) said that it had been settled ever [13] since the case in the 17 Ed. 3, (Year Book 17 Ed. 3, 52, 78,) that if a fine be levied by a *feme covert* without her husband, it shall bind her and her heirs, if it be not avoided by the husband ; and that both Rolle and Comyns seem to intimate that the law would be the same as to a recovery. In the same case, page 345, it was said, in reference to the power of a *feme covert* to dispose of her lands, that it would be more accurate to state the law to be, that a married woman can make no conveyance of her lands, except by fine or recovery, and that a fine levied by her *alone* is avoidable only by her husband.

The disability of a married woman to convey her lands by deed, was not supposed to arise from want of reason, but because by her marriage she was placed under the power and protection of her husband ; and it was upon that ground that the separate examination of such woman on a *fine* was good, because when delivered from her husband her judgment was supposed to be free. (*Hearle* v. *Greenbank*, 3 *Atk.* 712 ; *Compton* v. *Collinson, supra ;* 2 *Kent's Com.* 150 ; *Durant* v. *Ritchie*, 4 *Mason*, 54.) Judge Story, in the case of *Durant* v. *Ritchie*, said that fines, as a mode of conveyance, did not appear ever to have been adopted in this country ; and common recoveries, though resorted to for other purposes, were not known to have been used for the transfer of the estates of *femes covert.* Thompson, Ch. J. in *Jackson* v. *Gilchrist*, (15 *John.* 115,) in regard to the alienation of lands by married women, remarked that the common law modes, by fine and recovery, never were in use here.

The great object which the common law aimed at, was to ascertain whether the wife, in the transfer of her estate or interest in real property, acted under fear or compulsion of her husband. In a conveyance by fine and recovery, the wife was privately examined by the court, as to her voluntary consent, which removed the general presumption of the law that she was acting under the compulsion of her husband. (2 *Bl. Com.* 355 ; 5 *Cruise's Dig. tit.* 35, §§ 7, 8, 9 ; *Bool* v. *Mix*, 17 *Wend.* 128.)

Instead of using fines and recoveries for the conveyance of

[14] lands by married women, under the government of the colony of New-York, deeds were used for that purpose, and upon their simple acknowledgments by the grantors, or proof made by a subscribing witness before a member of his majesty's council, a judge of the supreme or county court, or a master in chancery, and sometimes before a justice of the peace, without private examination; and there were lands held under deeds of married women not acknowledged or proved even in the manner mentioned; which practices were recited in the act of the 16th of February, 1771, and such deeds were confirmed by it. As to future conveyances, it was enacted by that act, that no estate of a *feme covert* should thereafter pass by deed without a previous acknowledgment made by her, apart from her husband and on a private examination, that she executed the same freely, and without any fear or compulsion of her husband. (2 *Kent's Com.* 150; *Jackson* v. *Gilchrist*, 15 *John.* 109.) This act prescribing the form in which the deed of a *feme covert* should be acknowledged in order to pass her real estate, has been substantially continued in respect to married women residing in this state, in the successive revisions of the laws. (2 *Greenleaf*, 99, § 3; 1 *R. L.* 369, § 2; 1 *R. S.* 758, § 10.) No distinction is made, in either of the statutes referred to, between the effect of a deed executed by the husband and wife for the conveyance of her lands, where the wife resides in this state, and a deed executed by the wife without her husband for such purpose. By our usages and laws we have substituted her deed for a conveyance of lands in the place of the common law mode, by fine. It is conceded that it must have the same effect under our laws, where the husband joins with the wife, if properly acknowledged, as a fine had, at the common law, as a conveyance, where the wife joined with her husband in levying it. And I can see no reason why her deed, properly acknowledged, where the husband does not join with her in it, should not have at least as extensive an effect as a fine had, at the common law, when levied by her alone.

There is a distinction made by our statute in respect to the mode of executing a deed for the conveyance of lands situated

within this state, made by a married woman, depending [15] upon her residence alone. If she reside out of the state, the statute makes it necessary, in order to pass her estate by deed, that she " shall join with her husband" in the conveyance; but the acknowledgment or proof of the execution of such conveyance by her may be the same as if she were *sole*, and when so executed it is to have the same effect as if she were *sole*. (1 *R. S.* 758, § 11.) If she reside within the state, the only requisite provided by our statute in order to pass her estate in lands by deed, is, that she acknowledge, before some officer designated by the statute, on a private examination apart from her husband, that she executed such conveyance freely and without any fear or compulsion of her husband. There is no requirement that she shall join with her husband.

There is no pretence but that a married woman is a person capable of holding lands; if so, our statute (1 *R. S.* 719, § 10) enables her to convey even if she could not at common law. It enacts that " every person capable of holding lands (except idiots, persons of unsound mind, and infants,) seised of, or entitled to, any estate or interest in lands, may alien such estate or interest at his pleasure, with the effect and subject to the restrictions and regulations provided by law." The statute has made two classes of married women in reference to the mode and manner in which they may convey their estates or interests in lands situate within this state; residents and non-residents of this state. There is a single restriction or regulation only, *provided by law*, to be observed by a married woman residing out of this state, in order to alien her lands situated here, which I have referred to. It is that " she join with her husband" in the conveyance. And as to a married woman residing within this state, it is provided by the same statute (1 *R. S.* 758, § 10) that no estate of such married woman shall pass by any conveyance, which she shall not acknowledge, (before some officer designated,) on a private examination, apart from her husband, that she executed it freely, and without any fear or compulsion of her husband. This is the only restriction or regulation provided by law, applicable to married women residing within this state;

[16] which being observed in her conveyance, the plain inference is, that the estate of such a married woman shall pass by her conveyance, whether executed by her, with or without her husband's joining with her.

At the time Mrs. Treat executed the mortgage in question, she was seised of the premises in fee, capable of holding lands; and it is not pretended that she was either an idiot or a person of unsound mind, or an infant; and therefore was a person expressly authorized by the statute to alien her estate or interest in lands at her pleasure, subject only to such restrictions and regulations as were provided by law; and that as to them, the certificate of the officer before whom she acknowledged the execution of the mortgages, shows an exact compliance. The defendants insist upon another restriction, to her alienating her estate or interest in lands; that her husband must have joined with her in the conveyance, to give it the effect to pass her estate. I think that is answered by the fact, that there is no provision in our laws, making it necessary in order to the passing of the estate or interest of a married woman residing in this state, in lands of which she is seised or entitled to, that her husband should join with her in the conveyance.

It is said in 2 *Kent's Com.* 152, that the weight of authority would seem to be in favor of the existence of a general rule of law, that the husband must be a party to the conveyance or release of the wife, and that such a rule was founded on sound principles, arising from the relation of husband and wife. It was however admitted that there were exceptions to the rule, and that it was not universal in its application. In New Hampshire, the wife may alone, and in a separate deed, at a separate time, convey her right of dower. The assent of the husband is not necessary to the validity of her conveyance. (*Gordon* v. *Haywood*, 2 *N. H.* 402; 1 *N. H. Laws*, 193.) In Massachusetts, it was held in *Fowler* v. *Shearer*, (7 *Mass.* 14,) decided in 1810, and in *Stearns* v. *Swift*, (8 *Pick.* 532,) decided in 1829, that if after a sale and conveyance by the husband of his lands, the wife will voluntarily relinquish her claim to dower by a separate deed, it would effectually bar her dower. There is, how-

ever, a conflict between the decisions, whether the excep- [17] tion, to what is said to be the general rule, exists in Massachusetts. For in *Powell* v. *Monson & Brimfield M. Co.* (3 *Mason*, 347,) decided in 1824, it was held that the husband must be a party to the deed of release by the wife of her dower, and that rule was adhered to in *Shaw* v. *Russ*, (14 *Maine Rep.* 432,) decided in 1837. The question in the last case arose upon a deed of release executed by a married woman in January, 1817, in which her husband did not join, to the grantee of her husband in a deed made in November 1816, and was supposed to be governed by the statute law of Massachusetts, the release being executed before Maine became an independent state. It was said that it was provided by the provincial legislature, by statute 9 Wm. 3, ch. 7, that the widow should have her dower in lands sold or mortgaged, who had not joined with her husband in such sale or mortgage. And that by the statute directing the mode of transferring real estates by deed, (*Statutes of* 1783, *ch.* 37,) dower is saved to the widow, unless she had joined with her husband in the conveyance. The case of *Rowe* v. *Hamilton*, (3 *Greenl.* 63,) was decided in 1824. The point there decided was, that a *feme covert* could not bar her right of dower, by any release made to her husband during the coverture. But Mellen, Ch. J. who delivered the judgment of the court, reviewed the ordinance of 1641, and the several subsequent provincial statutes, and expressed the satisfaction of the court with the principles on which the decision of *Fowler* v. *Shearer* was founded.

The substitute in favor of a conveyance by the wife, of a deed for a fine or common recovery, was made at an early day by most if not all the colonial governments, by statutes which have been substantially continued to this period by legislative enactments. These statutes, in most cases, have expressly provided that the husband and wife must join in the conveyance, to have the effect of passing her present or contingent estate or interest in real estate. This is so as it respects Maryland, (*Lawrence* v. *Heister*, 3 *Har. & John.* 371 ;) New Hampshire, Massachusetts, Vermont and several other states. In Vermont, the right of a married woman to convey her lands by deed, is

[18] given by statute to convey "by deed of herself and baron," and making her separate examination and acknowledgment necessary, and to be certified upon the deed. (*Sumner* v. *Conant*, 10 *Verm. Rep.* 20.)

It is said (2 *Kent's Com.* 153,) that the particular question, whether the husband must be a party to the deed of release by the wife of her dower, to give it validity, has never been judicially settled in this state. Nor can I find that it has been judicially determined in this state, whether the husband must join in a conveyance with the wife, to convey real estate of which the wife is the owner, or whether she may alone, if a resident of this state, without her husband, by her deed, on due examination and acknowledgment of its execution, before a competent officer, convey her real estate. In *Jackson* v. *Vanderheyden*, (17 *John*, 167; *see also Gillet* v. *Stanley*, 1 *Hill*, 121; *and Constantine* v. *Van Winkle*, 2 *Hill*, 240;) it was said that the wife, at common law could pass her real property, by a fine duly levied; and under our statute, she might also, in conjunction with her husband, and on due examination before a competent officer, convey her real estate, or any existing or contingent future interest in it. But the point whether a married woman, residing within this state, can or can not convey her real estate, by her deed without her husband's joining with her in it, was not involved in the decision of either of these cases. So far as judicial decision is concerned it is an open question in this state. But if we may rely upon the dicta or casual remarks of learned judges, bearing upon it, but not involved in the questions determined, it may be as well sustained that a *feme covert* can during her coverture part with her interest in her real estate by deed without her husband, as that she must join with him to effect it. For in *Jackson* v. *Holloway*, (7 *John.* 81,) Thompson, J. observed that it was not necessary with us to have recourse to fine and recovery, in order to pass the estate of a *feme covert*. She may during her coverture part with the whole, or any portion of her interest in real estate, if the deed be acknowledged in the mode prescribed by the statute con-[19] cerning the proof of deeds. That the words of the act

were general, extending to any estate of the *feme covert.* There was no intimation that she must join with her husband to give validity to her deed.

I have come to the conclusion that a *feme covert* residing within this state has power to convey her estate or interest in her lands by her separate deed without her husband, if she acknowledge, before a proper officer, on a private examination apart from her husband, that she executed such deed freely and without any fear or compulsion of her husband, and such acknowledgment is properly certified by such officer ; and therefore that the mortgages executed by Mrs. Treat are valid and subsisting liens on lot No. 1.

As to lot No. 3, the legal estate, at the time of the execution of the mortgages in question, was vested in Lusk and Bay, as trustees of Mrs. Treat, (1 *R. S.* 738, § 48,) who had a *separate estate* in the rents and profits arising from it, during the life of her then husband, if she should so long live, and a future contingent estate in fee, depending upon the event that she survived her said husband. (1 *R. S.* 723, § 13.) I do not think that the trustees were authorized to mortgage any of the lands held by them as trustees of Mrs. Treat, even with her consent. Their power was limited in that respect " to sell and dispose of such parts (in fee simple or otherwise,) as Mrs. Treat, by writing under her hand should from time to time request or desire." This does not include a power to mortgage. (*Cumming* v. *Williamson*, 1 *Sand. Ch.* 17 ; *Waldron* v. *McComb*, 1 *Hill*, 111 ; *Bloomer* v. *Waldron*, 3 *Hill*, 361.) But I think the mortgages are valid liens upon lot No. 3, having been executed by Mrs. Treat and duly acknowledged by her. She had such an interest in the lot, as she could convey or mortgage. The decree of the supreme court should be affirmed.

GARDINER, RUGGLES, HURLBUT and HARRIS, Js. concurred.

TAYLOR, J. Although the powers of married women, to alienate their own real estates, are regulated by our statutes, yet it may be useful to inquire, for the purpose of elucidation,

[20] into the extent of such powers, and the mode of exercising them, by the common law of England.

Prior to the 31st day of December, 1833, when Parliament enacted the law for the abolition of fines and recoveries, 3 and 4 W. 4, ch. 74, married women had no power to alienate their own estates, or those of their husbands, except by fine and recovery. This was a circuitous, expensive and somewhat absurd method of arriving at a desirable result, which our more simple and sensible modes of alienation, accomplish by a direct process. The wife was held incompetent to dispose of her real estate by deed; nevertheless the husband and wife might jointly levy a fine of her lands, which would bar her and her heirs. The husband also might levy a fine of her lands, and bar her; for we are told the fine was of so high a bar, and of so great force, and of a nature so powerful in itself, that it precluded, not only those who were parties and privies to the fine, and their heirs, but all other persons in the world, who were of full age, out of prison, of sound memory, and within the four seas the day of the fine levied, unless they put in their claims within a year and a day, as appears by statute 18 Ed. 1; but by 34 Ed. 3, all persons were permitted to falsify the fine at any distance of time, which by 4 Hen. 7, was again limited to five years after proclamation made.

The old rule was that the husband must be a party with the wife to her conveyance; but if she levy a fine as a *feme sole* without her husband, it will be good against her and her heirs; though the husband may avoid it during coverture. (*Earl of Bedford's case*, 7 *Coke*, 71; 10 *Coke*, 43; *Acherly* v. *Vernon*, *Willes*, 160; *Compton* v. *Collinson*, 1 *H. Bl.* 341; *Cruise on Fines*, 110; 2 *Comyn's Dig.* 231–239; 1 *Roll.* 346, *b.* 50.)

The books all agree that although the wife have no power during the coverture, to alienate or charge her estate, so as to destroy her husband's interest therein, yet she may nevertheless, bar herself and her heirs, by a fine levied solely by herself, without her husband, if he do not enter and avoid the estate of the connusee; and the reason given, is because *she was ex-*
[21] *amined and had the power of the land.* (*Mary Portington's*

Albany Fire Insurance Co. *v.* Bay.

*case,* 10 *Coke,* 43; *Clancy,* 177; *Compton* v. *Collinson,* 1 *H. B* 334; *Roper,* 1, 142; 1 *Woodesons' Lectures,* 263; *Zouch and Bamfield's case,* 1 *Leon,* 82.) The wife and her heirs are estopped by this fine, to claim any thing in the land, and can not be permitted to say she was covert, against the record; (*Cruise on Fines,* 82; *Hob.* 225;) but the husband may enter and defeat it, either during coverture, to restore him to the freehold held *jure uxoris,* or after her death to restore him to the tenancy by the curtesy; because no act of the *feme covert* can transfer that interest which the intermarriage has vested in the husband. (*Cruise on Fines,* 82; *Clancy,* 178.)

The reason above given by Cruise, founded upon Hobart, why the *heirs* were estopped, namely, that they " can not be permitted to say she was a feme covert against the record," seems to me to conflict with the law as cited before, especially as to minor heirs. The original case in Hobart, however, does not go to such a length. His words are, " if a woman covert levy a fine alone, as if she were sole, this shall bind *her,* for the reason that *she* shall not be received to say that she was covert, though her husband shall;" but he makes no mention of heirs.

The doctrine evidently deducible from all the cases, places the estoppel upon just and reasonable grounds; the wife was allowed to alienate her estate of inheritance by levying a fine, and this would be a bar against her and her heirs, for the very satisfactory reason given in *Mary Portington's case* (10 *Coke,* 43,) " that she was examined and had the power of the land." But on the other hand she could not alienate or charge her estate " so as to destroy her husband's interest therein," and if levied during coverture, the husband might enter and defeat the fine, for the other equally satisfactory reason, namely, during coverture " to restore him to the freehold *jure uxoris,*" or after the death of the wife " to the tenancy by the curtesy."

If then the husband actually had no interest in his wife's estate, either *jure uxoris,* or by the curtesy, but having parted with all his marital rights, had become *functus officio,* he could not avoid the fine levied by his wife even by the common law, *cessante ratione legis, cessat ipsa lex.* The same doctrine is [22]

affirmed, in a different form, in *Compton* v. *Collinson*, (1 *H. Black*, 341.)

And hereupon Judge Reeves in his treatise upon the domestic relations, (*tit. Baron and Feme*, p. 114,) sensibly remarks, " if a wife in England, should convey her real property by a fine or common recovery, without her husband, if he did not afterwards disagree to it, she and her heirs would be bound, the coverture notwithstanding." In this case we have only to inquire, says he, whether any right of the husband is affected by it? and then he answers, most certainly it deprives him of the *usufruct* of such property. *Therefore it is,* that he may disagree to the conveyance, and render it void. By his disagreement to the conveyance of his wife, he restores himself to the freehold of such estate, which he holds in right of his wife during coverture; and as the case may be, to the tenancy estate, after her death, during his life. If his wife should die without having had by him a child born alive, he could not after her death have avoided her conveyance; for in that case his marital rights could not be affected by it; if he do not dissent to the conveyance of his wife, he waives that right, and no person can complain. The husband and wife are joined in a conveyance, that the husband may convey his estate therein, which lasts, at least, during coverture; and the wife joins that she may transfer the fee. If the husband had not any right which could be affected by the wife's conveyance of her real property, it would not be in his power, because he is a husband, to prevent her from conveying effectually, without his consent. She can do no act without his consent, which in any way impairs his rights; but if no rights of his are impaired, there is no reason why his consent is necessary. (*Reeves, Baron and Feme*, 115 ; *Compton* v. *Collinson*, 1 *H. B.* 341–346; *Walton* v. *Hele*, 2 *Saund.* 177 ; 2 *Br. C. C.* 385.)

The late eminent Chancellor Kent evidently entertained a strong bias against enlarging the powers of *femes covert;* and would willingly have reduced them much within the scope of the English rules, as appears from his opinion in *Jaques* v. *The* [23] *Methodist Epis. Ch.* (3 *John. Ch. Rep.* 78,) and in his com-

Albany Fire Insurance Co. *v.* Bay.

mentary upon the same doctrine as expounded in *Walton* v. *Hele*, (2 *Saund.* 177.) But in commenting upon the act of 16 February, 1771, he says that " the deeds of *femes covert*, in the form used in other cases, accompanied by such an examination, have ever since been held to convey their estates, or any future contingent interest in real property." (2 *Com.* 128.) A doubt expressed by him whether a deed would be void, without the joinder of her husband, I think from the context, refers very plainly to the case of a non-resident. In his remarks upon the case above cited of *Walton* v. *Hele*, he says, " this is a very strong case to show that the wife may deal with her land by fine, as if she were a *feme sole;* and what she can do by fine in England, she may do here by any legal form of conveyance, provided she execute under a due examination." (4 *Com.* 140 ; *see also his opinion in that case, in* 3 *John. Ch. Rep.* 145.)

In speaking of our statute, providing that no estate of a *feme covert* residing in this state shall pass *by her deed*, without a previous acknowledgment and a private examination, Judge Sutherland emphatically says, " this provision is an *enlargement* and not a *restraint* of the common law powers of a *feme covert.* It authorizes a less formal mode of conveyance than was known to the common law. It gives to her deed, when duly acknowledged, the same power and effect as a fine." (*Martin* v. *Dwelly*, 6 *Wend.* 12.) We have seen that by fine, a married woman could bar herself and her heirs. But if any of the husband's marital rights were compromitted by it, he could falsify the *fine.* Our statute is an enlargement of the common law power of a *feme covert.* She can by deed, duly acknowledged, bar herself and her heirs ; but if any marital rights are infringed by her conveyance, he has his remedy by action against the grantee. Very soon after the settlement of this country, the mode of alienation by *femes covert*, by deed, prevailed, and the expensive process by *fine*, fell into disuse. (*Jackson* v. *Gilbert*, 15 *John.* 109.)

The charter of the Duke of York, adopting the principle which was essential to the validity of a fine, required the private examination of the *feme covert*, to the validity of her [24]

deed.   But that charter had no existence after 1688.   A simi-
lar requirement was found in an act of the colonial legislature
passed 1691, but was repealed in 1697.   The first formal act of
the colonial legislature recognizing the right to record the deed
of a *feme covert*, conveying real estate, was passed 1771, which
recited that " whereas it has been an ancient practice in this
colony to record deeds concerning real estates, upon the previ-
ous acknowledgment of the grantors, or proof made by any of
the subscribing witnesses, before a member of his majesty's
council, a judge of the supreme or county court, or a master in
chancery, and sometimes before justices of the peace; and
whereas there are lands and tenements held under the deeds of
*femes covert*, not acknowledged in manner aforesaid, and yet
made *bona fide*, and for valuable consideration; the purchasers
whereof, and those holding under them, ought to be secured
both in law and equity, against the respective grantors, their
heirs and assigns."   It was therefore enacted, " that no claim
to any real estate, whereof any person is now actually pos-
sessed, shall be deemed to be void, upon the pretence that the
*feme covert*, granting the same, had not been privately examined
before any of the public officers or magistrates aforesaid."   The
act then directs the manner in which deeds should thereafter be
acknowledged and recorded.   As nothing is said in the act
about the concurrence of her husband, the law, *ex vi termini*,
rendered the acts of the feme covert valid, though the hus-
band did not join.

The act concerning tenures, passed 1787, provides that it
shall forever thereafter be lawful for every freeholder to give,
sell, or alien the lands or tenements, whereof he or she was or
at any time thereafter should be seised in fee simple."   While
the law of 1771, which has remained and from time to time
been re-enacted without change, makes the validity of the deed
of a *feme covert* depend solely upon her previous acknowledg-
ment, in the manner there provided.

So far as my researches extend, there has been no decision in
our courts directly upon the point at issue, though I find several
[25] incidental expressions of several judges, not amounting in

authority even to *obiter dicta.* In *Jackson* v. *Vanderheyden*, (17 *John.* 168,) the question was whether a *feme covert* was bound by her covenant of warranty; and Spencer, judge, merely says, "she may, in conjunction with her husband, convey her real estate," of which there certainly can be no doubt. In giving his opinion in *Martin* v. *Dwelly*, (6 *Wend.* 13,) Judge Sutherland quotes this remark of Judge Spencer without explanation; although in the same case he says, "the statute gives to her deed, when duly acknowledged, the same power and effect as a fine." The same remark of Judge Spencer was also quoted in that case by Beardsley, senator, to which he adds the very erroneous observation, that "at common law the wife could part with her interest in lands only by joining *with her husband in a fine.*" These remarks were all out of place, for the only question before the court in *Martin* v. *Dwelly* was, whether a deed executed *jointly with* her husband, but not *acknowledged* pursuant to the statute, was valid against the *feme covert*, as an *agreement to convey.*

In a later case, (1 *Hill*, 121,) a deed was executed by several *femes covert*, without their husbands, and not acknowledged by them on a separate examination, as the statute requires. His honor Judge Bronson in his opinion to be sure states the fact truly, that the *femes covert* executed the deeds without their husbands; but there is nothing in the case to show that he put his decision at all upon that ground; for he says "there was no such acknowledgment as the statute required for passing the estate of a *feme covert*," and then adds "without an acknowledgment on a private examination, &c. the deed was a mere nullity."

On the other hand, in the case of *Jackson* v. *Holloway*, (7 *John.* 86,) Thompson, judge, says, "she (feme covert) may, during her coverture, part with the whole or any part of her interest in real estate, if the deed be *acknowledged* in the mode prescribed by the statute." "The words of the statute are general and extend to any estate of the *feme covert.*" A similar opinion, unqualified by any joining of the husband, is expressed [26] by Kent, chancellor, in *Demarest* v. *Wynkoop*, (3 *John. Ch.*

*Rep.* 144.)   Late English decisions can have no bearing on this case, as all conveyances by *femes covert* are now made in England by deed, under the provisions of the statute for the abolition of fines and recoveries, passed 3 and 4 Wm. 4, ch. 74, the 77th section of which, unlike ours, expressly requires the husband's concurrence, except as otherwise provided by that act.

I am of the opinion that the mortgages executed by Gertrude Treat, without the concurrence of her husband, having been acknowledged pursuant to the statute, were valid deeds ; and the judgment of the court below should be affirmed.

PRATT, J. and BRONSON, Ch. J. dissented, and the former delivered his opinion as follows :

The decision of the court below, as to lot No. 3, was clearly right.   The power given to the trustees, by the first codicil to the will, was sufficient to authorize them to mortgage the trust estate.   It empowered them to dispose of it in fee simple or otherwise, as the cestui que trust should request or desire.   Under this general delegation of power, the right to mortgage is clearly included.   The cases of *Cumming* v. *Williamson*, (1 *Sand. Ch. Rep.* 17 ;)   *Waldron* v. *McComb*, (1 *Hill*, 111 ;) and *Bloomer* v. *Waldron*, (3 *Hill*, 361,) were cases of a naked power to sell.   In such cases a power to mortgage can not be implied. But the power to dispose of in fee simple or *otherwise*, would seem to include within it every disposition of the property, which the absolute owner thereof might or could make.

But the important question in this case arises in regard to the real estate, designated in the case as lot No. 1, whether the mortgages in suit are liens upon the interests of the heirs of Gertrude Treat in that lot.   The supreme court placed their decision upon the assumption that the interest of Gertrude Treat in that lot, at the time of the execution of the mortgages, was of [27] the nature of a separate estate, which, in equity, she had the power to dispose of as a feme sole.   If the court was right upon this point, it obviously disposes of the other points in the case.

It becomes, therefore, a question deserving of a careful examination.

The trust created for the benefit of Mrs. Treat, by force of the will alone, was only a separate estate in her during her husband's life. The testator, at his death, was seised of that life estate only, and he could not possibly devise a greater estate than he owned. A life estate, therefore, is all that was vested in the trustees for her benefit. If therefore, a separate estate became vested in her greater than this life estate, which she had the power to dispose of as a feme sole, it must have occurred in one of two ways. Either the estate of inheritance which was vested in her before, became merged in this equitable life estate, or that estate of inheritance was a separate estate in her, independent of the devise. I am satisfied neither of these alternatives are tenable.

Separate estates in married women, which courts of equity recognize their right to dispose of as femes sole, are strictly equitable estates. They are always created by deed, devise or marriage settlement, vesting the legal estate in some third person. Her power over such property is in the nature of a power of appointment, and she is confined in the exercise of the power to such restrictions as are contained in the instrument creating the estate. (3 *John. Ch.* 77; *Story's Eq. Jur.* 1393; 9 *Smedes & Mar.* 435; 4 *Barr*, 93; 4 *Yerger*, 375.) But the estate which is left in the wife, in lands held in her right after the husband's life estate has been disposed of to a third party, is strictly a legal estate. And it can not be necessary to cite authorities to show that a legal estate of inheritance can not be merged in an equitable estate, so that the whole should become an equitable interest only. The legal title must be vested in some one, and uniting the legal and the equitable in one person, could not possibly have the effect to divest him of his legal interest. If the interests are such as to effect a merger by uniting them, the equitable must necessarily merge in the legal interest.

Nor is the second alternative any more tenable. As we [28] have already said, this estate is strictly a legal one, and can only be aliened by her in some mode recognized by courts of law.

It is no more a separate estate than any future estate vested in a married woman. Vested remainders and other estates of the same character, where there has been no actual seizin that would entitle the husband to curtesy, would be separate estates within the principle contended for. These are all strictly legal estates, and courts of equity recognize in married women no greater power to dispose of them than is recognized by courts of law. It is only strict equitable titles which courts of law do not recognize at all, that may be transferred by a married woman as a feme sole. If courts of equity should recognize a different method of disposing of legal estates from that required by courts of law, titles to land would be involved in inextricable confusion.

Again, if this is to be deemed a separate estate in the wife, it may be transferred by her by deed with a simple acknowledgment, without any private examination, nay, without any acknowledgment at all, as far as the mere validity of the conveyance is concerned. But it would not be pretended that the wife's interest in lands held by the husband in right of the wife, could be conveyed by the joint deed of herself and husband, without an acknowledgment by her upon a separate examination according to the statute. If, therefore, the conveyance of the husband's interest leaves a separate estate in the wife, which she can convey as a feme sole, it presents this absurdity, that the husband and wife by separate conveyances can pass an interest which they could not pass by a joint conveyance. Again, if this interest of the wife be in the nature of a separate estate, then the proceeds of a sale of such interest would also be her separate property, and not subject to her husband's control; yet if the same property be transferred by a joint deed of conveyance, he would be entitled to the consideration money as soon as received. In fine, it is clear that the mortgage can not be sustained as a lien upon the land, upon the assumption that the [29] whole interest of Mrs. Treat was in equity in the nature of a separate estate, and thus subject at the time of the execution of the mortgage to her control and disposal as a feme sole.

The remaining question, and one which does not seem to have been expressly adjudicated in this state, is whether a married

woman can convey her legal interest in lands alone, without her husband joining with her in the conveyance. At common law, a *feme covert* could not convey her interest in lands by deed at all, her deed being absolutely void. This was the necessary effect of the marriage relation upon the condition of the wife, and her power to contract. "By the marriage, the legal existence of the woman was suspended, or at least incorporated and consolidated into that of her husband, under whose wing, protection and cover, she performed every thing." (1 *Black. Com.* 442.) Having no capacity to contract, it followed as a necessary consequence, that her deed of conveyance was void. Still a method of conveyance was invented through the aid of the courts of law, by which, with the concurrence of her husband, she was enabled to alien her lands. They might join in levying a fine or suffering a common recovery. And although this method probably originated in actual suits, where the title of the wife to the lands was actually litigated, and adjudged, yet it has been, since the time of the oldest reports in England, considered a mere species of conveyance, as much so as a transfer of lands by grant or deed of bargain and sale. But her husband was always required to join with her in levying a fine, or suffering a recovery; and a fine levied by a *feme covert* alone where her coverture appeared upon the record, was void, or at least voidable, and would neither bind her nor her heirs. (2 *Roper on Husband and Wife,* 141; 1 *Siderfin,* 122; 1 *Taunton,* 35; 2 *Wilson,* 1.) Where the wife levied a fine as a *feme sole,* and her coverture did not appear upon the record, if the husband did not avoid it in his lifetime, it would bind her and her heirs. (2 *Roper,* 141.) This was put expressly upon the ground that she was estopped from contradicting the record and alledging that she was a *feme covert,* when by the record she appeared to be a *feme sole.* (2 *Roper, sup.; Hobart,* 225.) Some of the [30] elementary writers have not noticed this distinction, and have therefore laid it down as a general rule, that a fine levied by a married woman was binding upon her and her heirs, unless her husband entered in his lifetime and avoided it. (2 *Kent's Com.* 151; *Clancy, H. & W.* 177.) But upon a critical examination

of the authorities, the distinction will be found clearly established. (*Hobart*, 225; ·2 *Wilson*, 1.) It is manifest that a fine thus levied bound the wife, on the ground of estoppel alone; for it was always competent for the husband to enter and avoid the fine, for the benefit of the wife and her heirs, as well as for himself. (2 *Kent's Com.* 151; *Clancy*, 178; *Co. Lit.* 46, *a.*) If therefore it operated as a direct conveyance of the wife's inter-. est, the entry of the husband might restore him to his own rights; but it would not affect her interest. Subject to this exception, a fine levied by a married woman without the concurrence of her husband was void, and bound neither herself nor her heirs, and the same rules were also applied to common recoveries. (1 *Roll. Ab.* 347; 2 *Com. Dig.* 97.)

So copyhold lands held in right of the wife, might be disposed of by the husband and wife joining in a surrender. (1 *Roper on H. & W.* 142.) And in some localities, by a particular custom, the wife's interest in lands might be aliened by the husband and wife joining in a deed of bargain and sale. (*Roper*, · *supra;* 2 *Inst.* 573.) But by no custom was the concurrence of the husband ever dispensed with at common law. Thus in the case of *Stevens* v. *Tyrell*, (2 *Wils.* 1,) an attempt was made to sustain a surrender of copyhold lands, made by the wife without her husband's concurrence, by proving a custom to that effect; but the court held that such a custom would be contrary to law, and the proof was rejected. (*Bell on H. & W.* 194.) It is true that the court of common pleas, in *Compton* v. *Collinson*, (1 *H. Bl.* 334,) held a surrender by a *feme covert* good, but in that case the husband had covenanted that the wife might surrender at any time, and he would join with her. The decision of the court cannot be supported upon any other ground.

In all these methods of conveying the interest of a feme covert in lands, it was also necessary in order to conclude her, in [31] addition to the concurrence of her husband, that she acknowledge upon a private examination that the act was voluntary on her part, and not influenced by fear or compulsion of her husband. (2 *Bl. Com.* 293.)

At common law, therefore, two things were deemed essential

to enable a female covert to convey her lands ; 1st, the concurrence of her husband ; and 2dly, that the act be ascertained in the mode prescribed by law to be voluntary on her part, and not from fear or compulsion of her husband. The reason of these restrictions is very concisely stated by a late writer upon the marriage relation. " For the wife, by the disabilities of coverture, was precluded from disposing of her lands without her husband's concurrence, and to guard her against an undue exercise of marital authority on his part, the law would not suffer her to part with her interest until it was first ascertained that it was of her own free will." (*McQueen, Husband and Wife*, 27.) The same restrictions are preserved in the late act of 3 and 4 William 4, ch. 77, abolishing fines and recoveries. By that act married women are enabled to convey their lands by deed of bargain and sale, but it is made necessary that the husband join in the conveyance, and that the wife acknowledge, before certain officers therein specified, that she executed the deed freely and voluntarily.

In the early settlement of this country the common law mode of conveying the lands of married women by fine or common recovery was never adopted by the colonies, but the more simple mode of conveyance by deed was used. We have no authentic history of the circumstances under which this mode came into practice. Able jurists have suggested different theories in regard to it. It is sufficient that the custom became so general at an early period in the colonies, that it became a portion of the general law of the land, and as firmly established as if it had been expressly enacted by statute. Nor have we any authentic history of all the solemnities which were then deemed necessary to be observed in the form and execution of these deeds of conveyance. But that it was deemed necessary that the husband should join in the deed seems to be universally conceded. It was also essential that the wife should acknowledge it on a [32] private examination. If we had no authority upon the subject we should come to the conclusion that these requisites were not dispensed with by the colonists. Although from the great importance among the early settlers of having cheap facilities for

the transfer of lands, they might well adopt the custom of some locality in the mother country instead of the tedious and expensive method of alienation by fine or common recovery, especially as they had not the requisite courts to make that method available: yet they would not be likely to reject any essential requirements, whose observance would be attended with no particular inconvenience. They generally adhered strictly to the common law, a cardinal principle of which was that a feme covert had no power to contract or dispose of property independent of her husband.

But we are not left to speculation alone upon this point, as to what was in fact the custom of the colonies in this respect. In *Fowler* v. *Shearer*, (7 *Mass.* 14,) Chief Justice Parker speaks of the custom of married women conveying by deed, as the common law of New England, and says "that the usage never extended to authorize the wife to convey any interest she has in lands without her husband joining in the deed of conveyance." The same is laid down as the custom by Judge Story. (3 *Mason*, 347; 5 *id.* 67; 4 *id.* 45, 62, 273. *See also Jackson on Real Actions*, 326; 14 *Maine Rep.* 432; 3 *Greenl.* 63; 1 *Verm. Rep.* 20.) To show that the usage in other colonies was the same, I may cite 1 *Dallas*, 11, 15; 1 *Binney*, 47; 3 *Har. & Gill*, 371. The same custom of the colonies is still adhered to, and has not only become the settled law of those states, but the new states have also adopted the same principle. Unless the state of New-York is an exception, I know of no state in the Union where the common law is in force which does not require, to render the deed of a married woman valid, that the husband shall join with her in the deed. (3 *Rand.* 464; 9 *Mass.* 161; 4 *Conn.* 44; 1 *Pet.* 109; 1 *Fair.* 178; 3 *Blackf.* 201; 7 *id.* 66; 3 *Litt.* 395; *Wright*, 205; 3 *Wharton*, 457; 9 *Ham.* 121; 3 *Har. & Gill*, 371; 1 *Dall.* 11; 1 *Binney*, 47.) [33] Chancellor Kent, after an elaborate examination of this subject thus concludes: "Upon this view of our American law on the subject we may conclude the general rule to be that the husband must show his concurrence to the wife's conveyance by becoming a party to the deed, and that the cases in which her

deed without such concurrence is valid, are to be considered exceptions to the general rule." (2 *Kent's Com.* 154.) The exceptions here alluded to relate to some cases in two or three states, which have held that the wife may, after a sale by her husband, by a separate deed release her right of dower to the grantee of the husband. (2 *N. H.* 176, 405; 7 *Mass.* 14; 3 *Greenl.* 63.) But in Massachusetts this exception is understood now not to exist. (3 *Mason*, 347; 4 *id.* 273; *Jackson on Real Actions*, 326.) The cases in Maine having merely followed what was supposed to be the rule in Massachusetts, it is now no longer the rule in that state. (14 *Maine*, 432.) In any view of these cases they must be deemed exceptions to the general rule which is explicitly recognized in those states where the exception is said to prevail. (2 *Kent's Com.* 153.) In many of the states the concurrence of the husband is made necessary by express statutes; but except in the new states these statutes only enacted what had already become law by general usage, or rather the usage itself had grown out of the requirements of the common law, and hence these statutes may be deemed simply declaratory of the common law. In the new states some statutory regulation was probably deemed necessary in order to abolish the common law method of conveyance by fine and common recovery, and to substitute the conveyance by deed. Hence most of their statutes relating to the subject are in form enabling statutes— enabling married women to convey by deed, but retaining in other respects all the substantial requirements of the common law method of conveyance.

We come then to the great question in this case : Does the state of New-York form an exception to all the states of the Union, in regard to the necessity of the concurrence of the husband in the deed of conveyance of the lands of the wife ? It is incumbent on those who alledge that this state is an exception to every other state or country where the common law pre- [34] vails, to prove it. Until that can be done, the presumption that the same law prevails here that prevails elsewhere in relation to this subject is irresistible. Unless therefore the statute of this state has changed the common law rule requiring the husband

to join in the conveyance of the wife's lands, the case is clearly
with the defendants. It is equally clear that he was required
to join in the conveyance prior to the passage of the statute.
This leads me therefore to the examination of the statute in
question, and its effect upon this point; for the conclusion to
which my brother Jewett arrived was influenced, I understand,
mainly by what was supposed by him to be the force and effect
of our statute in relation to the proof and recording of convey-
ances of real estate. (1 *R. S.* 758.) That part of this statute
in relation to the acknowledgment and recording of deeds exe-
cuted by married women was first passed in 1771, and has
remained substantially the same ever since. In order to ascer-
tain the true construction to be given to it, it becomes necessary
to look at the circumstances under which it was enacted and
the mischiefs which were intended to be remedied by it. Its
title is " An act to confirm certain ancient conveyances, and di-
recting the manner of proving deeds to be recorded." The pre-
amble shows that irregularities had crept into practice in
regard to the *acknowledgments* of deeds of conveyance by mar-
ried women, and the first section of the act provided for con-
firming titles held under such deeds of conveyance, whilst the
second section provided for future conveyances, " that no estate
of a feme covert should henceforth pass by her deed, without a
previous acknowledgment by her apart from her husband," be-
fore certain officers therein specified, who were to make a certifi-
cate thereof in the form substantially as required by the existing
statute. (3 *R. S. App.* 22; 1 *R. S.* 758.) It is plain to me
that the mischief which was intended to be remedied by this
statute consisted in the want of the requisite private examina-
tion of the feme covert. But whatever the irregularities may
have been, they were clearly connected with the proper acknow-
ledgment of the instrument, and did not relate to any other
[35] question touching its form or execution. It was this irregu-
larity and this alone, which it was the purpose of the act to
remedy. The act can therefore decide nothing in relation to
the question whether the deed of a feme covert would be valid
without the concurrence of the husband. It is simply a restrain-

ing act, requiring deeds conveying the lands of married women to be acknowledged by them before certain officers and in a certain form, and restricting them from acknowledging in any other manner; thus preventing the repetition of the irregularities specified in the preamble, and re-establishing the ancient usage and custom of the colony in that respect. Such has been the construction of the act in numerous cases in our courts. (2 *Barb. Ch. Rep.* 268 ; 17 *Wend.* 128 ; 15 *John.* 84.) The act does not purport nor was it intended to provide for the general requisites of the conveyance of real estate by married women, or under what circumstances they might make a valid deed of conveyance. That was left unchanged and unaffected by this act, and can not therefore be said to throw any light upon the main question under consideration.

This appears more clearly by the examination of some subsequent acts. This act was intended to apply to residents of the state ; but lands were also held by married women who were non-residents of the state, and who might desire to alien them. As they would not be affected by our local customs allowing femes covert to convey by deed, it became necessary to pass the act of 1773. (3 *R. S. App.* 23.) The purpose of the latter act would make it necessarily an enabling act, and it would be required to contain all the provisions deemed necessary to enable non-resident married women to make a valid conveyance, and at the same time to surround the exercise of that power with all those safeguards and restrictions required by the principles of the common law. And hence we find it both in form and substance an enabling act, containing all the provisions in relation to the acknowledgment contained in the act of 1771, and also the provision that the deed *must be executed in conjunction with the husband.* Is it reasonable to suppose that the legislature intended to make a distinction in the two cases ? that they intended to dispense with the concurrence of the hus- [36] band in deeds executed by married women residing in the state, but to require his concurrence in deeds executed by married women residing out of the state ? to throw around the latter all the protection and restrictions required by the common law

in the alienation of their lands, and leaving the former with no such protection? It would be very difficult to assign any plausible reason for such distinction. Nor is there any such distinction; but the difference in the phraseology of the two acts naturally and necessarily arises from the purpose which the legislature had in view in their enactment—the former being simply a restraining act intended to remedy certain specified mischiefs, whilst the latter is a general enabling act, containing all the provisions necessary in a conveyance by a married woman.

This construction of the statute receives confirmation from another part of the statutes of the state, which provides that " if a married woman execute a power by grant, the concurrence of her husband as a party shall not be necessary." (1 *R. S.* 736, § 117.) If such concurrence is not required in any case, this provision was entirely unnecessary. It therefore raises a strong implication that the legislature understood that in ordinary cases his concurrence as a party was required.

Again, although the point has not been directly adjudicated, the necessity of the husband's concurrence in the wife's deed has been assumed in numerous cases, and not a case or dictum, I venture to say, can be found in any book which sanctions an opposite assumption. (15 *John.* 87; 17 *Wend.* 128; 1 *Hill,* 121; 2 *id.* 249; 6 *id.* 177; *S. C.* 2 *Barb. Ch. Rep.* 268.) Several cases have indeed been cited by my brother Jewett, where nothing at all was said upon the subject, and for very obvious reasons. No question relating to this subject was raised in any of the cases. Now it will not require argument to show that affirmative dicta upon questions not arising in the case are entitled to but little weight. I am therefore utterly at a-loss to conceive how the absence of such dicta should prove any thing. The fact that no case has ever arisen in our courts where any one has ventured upon the hazardous experiment of [37] taking a title to lands from a married woman without her husband's concurrence, would seem to indicate the general sense of the legal profession, and is sufficient at least to overthrow all inferences from mere absence of authority.

Albany Fire Insurance Co. *v.* Bay.

The statute providing " that every person capable of holding lands, (except idiots, persons of unsound mind and infants,) seized of or entitled to any estate or interest in lands, may alien such estate or interest at his pleasure, with the effect and *subject to the restrictions and regulations provided by law,*" (1 *R. S.* 719,) has been invoked to support the position that the concurrence of the husband is not necessary. This statute states only a truism which this whole investigation assumes. We' assume that a feme covert has the right and ability to alien her lands, *subject to the restrictions and regulations provided by law,* and the only embarrassment which I have felt in the case has been occasioned by the difficulty in ascertaining the particular restrictions and regulations to which the right itself is subject. Upon this particular point the statute has afforded *me* but little aid.

In fine, whether we appeal to the general principles of the common law, to the requirements considered essential in every mode of conveying the estates of married women known to the English courts, to the colonial history of our country, to the universal custom of the other states, to the statutes and adjudications of our state, or the universal understanding of the profession, all concur in one result; to render a deed of conveyance by a married woman valid, it is essential that the husband should join with her in the deed. It follows therefore that the mortgage in suit in this case is not a valid lean upon the interest of the heirs of Gertrude Treat in the premises known as lot No. 1.

The money of the plaintiffs has been, it seems, expended in improvements upon the premises, which have added very much to their value; and it would be highly proper that those who have been benefited by the improvements should pay for them. But it will not do to pervert settled and salutary principles of law to obviate what may seem hard cases. Neither considerations of this character, nor the spirit of transcendentalism, by which it has lately been discovered that the conjugal relation may be improved by discarding all the salutary maxims [38] not only of the common but of the divine law applicable to that relation, and creating separate and conflicting interests between

husband and wife, should influence our. conclusions. It is true that emanations of the latter spirit have crept into our statute book, whether for good or for evil time will determine. But this case having arisen under the law as it has existed for centuries, we should not anticipate cases which may arise under what may be considered by some the new era of light and knowledge.

I am therefore of opinion that the decisions of the courts below as to lot No. 1 be reversed.

BRONSON, Ch. J. concurred in the opinion of Judge PRATT.

Decree affirmed.