HELENA I. BROWN et al., Appellants, *v.* MARY M. WADS-WORTH et al., Respondents.

1. REAL PROPERTY — RULE IN SHELLEY'S CASE — ESTATES OF DIFFERENT QUALITY. The rule in Shelley's case does not apply to a conveyance made under the direction of a court of chancery to the guardian of an infant married woman in trust to receive and pay over to her the rents and profits during her life and thereafter to her husband for life; and after his death in case he survives her, and after her death whether he be then living or dead, "to have and hold such premises and the rents, issues and profits thereof in trust to and for the sole use, benefit and behoof" of her right heirs, to them, their heirs and assigns forever, because under such deed she took an equitable life estate and her right heirs an estate of a different quality, namely, a legal estate, and the gift over to them must, therefore, be construed as a purchase and not a limitation.

2. POST-NUPTIAL JUDICIAL SETTLEMENT — CONSENT OF INFANT MARRIED WOMAN. An order by the chancellor directing that a conveyance to be made to the guardian of an infant married woman of real estate purchased with the proceeds of a sale of her interest in other real property

which were already in the custody of the court should give her an equitable life estate with remainder to her right heirs upon the death of herself and husband is not invalid for want of jurisdiction because of her incapacity as an infant to give her consent, or because her legal rights were suspended by coverture and subjected to the marital rights of her husband, as the whole matter was within his judicial discretion and the proceeding was not to deprive her of her estate but to confirm and protect her equities in it.

3. AMENDMENT. A married woman who deems herself aggrieved by a post-nuptial judicial settlement of her property in the custody of the court may at any time, notwithstanding her infancy or coverture, invoke chancery to amend the settlement.

4. DISAFFIRMANCE BY WIFE. A married woman cannot by her mere disaffirmance upon attaining her majority invalidate a post-nuptial judicial settlement of the proceeds of the sale of her property which were in the custody of the court or an order in the proceedings directing that a conveyance to be made to her guardian of real property purchased with such funds should provide that such property should be vested in her right heirs as remainder upon the death of herself and husband.

5. CONSENT OF WIFE. The absence of a waiver by a married woman of her equities ir favor of her husband is a sufficient basis for a post-nuptial judicial settlement in favor of herself and her children of her property in the custody of the court, and no affirmative evidence of her consent is essential to its validity.

6. MARRIED WOMEN — CONSENT TO TRUST DEED. A married woman by uniting with her trustee and her husband in a conveyance, under the permission of the Court of Chancery, of real property in which, by virtue of a deed made in compliance with a post-nuptial judicial settlement of her property in the custody of the court, she had an equitable life estate with remainder to her right heirs upon the death of herself and husband, for the purpose of purchasing other property in its place, thereby consents to a similar trust provision in the conveyance of the substituted premises.

7. DISABILITY OF COVERTURE REMOVED ·BY DIVORCE. If coverture holds in suspense the validity of a deed made in a post-nuptial judicial settlement of the wife's property in the custody of the court for the purpose of providing for herself and her children, or of a deed of substituted property containing the same provision, the disability is removed by a judgment of absolute divorce in her favor which, by its terms, transferred to her her husband's interest in the premises.

8. TRUST — RIGHTS OF BENEFICIARIES. A married woman to whom the trustee in a deed of real property, substituted with her consent for property conveyed to her guardian under a post-nuptial judicial settlement of her property in the custody of the court, conveys her interest under chapter 375 of the Laws of 1849, after she has obtained a judgment of absolute divorce against her husband, can do nothing to defeat the

interests of her right heirs as settled by such deed by virtually the same provisions as those contained in the earlier deed.

*Brown* v. *Wadsworth,* 44 App. Div. 630, reversed.

.(Argued May 22, 1901; decided October 4, 1901.)

, Appeal from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered October 25, 1899, affirming a judgment in favor of defendants entered upon a verdict directed by the court.

This is an action of ejectment brought to recover an undivided one-third part of certain premises situated on Bridge street, in the borough of Brooklyn. The plaintiffs are the children and sole heirs of Ulmer C. Russ, deceased, who was one of the three children of Catharine Russ, from whose grantee defendants derive their claim of title. The land in controversy stands in the place of a one-seventh interest in certain real estate devised to the said Catharine Russ by one Nicholas R. Cowenhoven, who died prior to 1826, subject to the estate of her father therein for his life and to the condition of her surviving him. In 1827 this interest was sold for her benefit under the direction of the Court of Chancery of this state, she being at that time between eighteen and nineteen years of age and married to one John A. Russ, who joined with her in the petition for leave to sell. Her father and guardian, William Cornell, by whom the sale was conducted, by direction of the Court of Chancery, invested part of the proceeds in certain other real estate situated in York street, in what is now the borough of Brooklyn, and took a deed thereof from one Ebenezer Tallman, bearing date April 3, 1827, in which, at the end of the habendum clause, was contained the following provision : " In trust, nevertheless to demand, receive and recover the rents, issues and profits of such premises and to pay over the same to the said Catharine Russ for and during the term of her natural life, or to such person as she shall from time to time, but not by way of anticipation, notwithstanding her coverture, direct and appoint, to be for her sole and separate use, and in no way subject to the control of debts or incumbrances of her husband; and

from and after the death of the said Catharine Russ living, the said John A. Russ, then upon trust to pay such rents, issues and profits to the said John A. Russ for and during the term of his natural life, and from and after the death of said John A. Russ, in case he survives the said Catharine, and also from and after the death of the said Catharine whether the said John A. Russ be then living or dead, to have and to hold such premises and the rents, issues and profits thereof in trust to and for the sole use, benefit and behoof of the right heirs of the said Catharine Russ, to them, their heirs and assigns forever."

William Cornell having died, one Daniel Richards was, upon the petition of Catharine and John A. Russ, her husband, appointed substituted trustee, the persons who were her heirs presumptive being parties to the proceeding, and, in 1835, the new trustee together with Catharine and John A. Russ filed a petition in the Court of Chancery praying that the trustee might sell the York street property and invest part of the proceeds in the purchase of the premises in Bridge street, which forms the subject-matter in this suit, and that the conveyance might " be taken by the said Daniel Richards upon the like trusts as were expressed and declared in and by the original trust conveyance hereinbefore mentioned from Ebenezer Tallman to William Cornell." The application was referred to a master in chancery, and he having reported favorably thereon, the vice-chancellor ordered the trustee to make the sale and purchase as requested. At the time of both of these proceedings John A. Russ was absent from the country, and Catharine Russ signed for him by power of attorney. Their child, who was born prior to the last proceeding, was not made a party thereto. The York street property was, on March 30, 1835, conveyed to one William T. Ryer by an instrument executed by Daniel Richards as trustee and by Catharine Russ and John A. Russ by Catharine as his attorney, and on April 29, 1835, the Bridge street property was conveyed by Daniel Bedell, the owner, to Daniel Richards as trustee, the conveyance containing substantially the

same trust provision as was contained in the deed of the York street property of 1827.

There were three children of the marriage of Catharine and John A. Russ, viz., John A. Russ, Jr., Ulmer C. Russ (the father of the plaintiffs) and Cornelia Matilda Russ (now Cornelia Matilda King).

In 1852 Catharine Russ obtained a judgment of absolute divorce from her husband in the Supreme Court of this state, all his interest in her real property being transferred to her by the judgment in lieu of alimony.

In 1853 Daniel Richards petitioned for leave to resign as trustee of the Bridge street property, and the petition was referred to a referee who, in 1856, made his report, one of the findings of which was that " no one has any interest except Catharine and her heirs at law," and the court thereupon decreed that such trustee " be authorized to convey to the said Catharine Russ, by a good and sufficient deed of conveyance, the premises in said petition described, and all his estate therein, and that. upon delivery of said deed to the said Catharine Russ and upon her acceptance thereof, that the said Daniel Richards be discharged."  Thereupon on September 4, 1856, the trustee conveyed the property to Catharine Russ to have and to hold the same " unto the said party of the second part, her heirs and assigns, to her and their only proper use, benefit and· behoof forever."  In 1866 Catharine Russ conveyed the said property to her son John A. Russ, Jr., with habandum to him, his heirs and assigns forever, with warranty and full covenants, the consideration being stated as $3,650.   In 1869 her other children quitclaimed to John A. Russ, Jr., upon a stated consideration, and from him. defendants claim title.   The plaintiffs claim a legal title to an undivided one-third interest in the premises under the deed of 1835 as heirs at law of Catharine Russ.   John A., Jr., and Ulmer C. Russ predeceased their mother, who died in 1894.

*Edward B. Whitney* and *Charles Robinson Smith* for appellants.  The language of the conveyance under which

plaintiffs claim is absolutely controlling, and all extrinsic evidence to affect its meaning is incompetent. (*Parkhurst* v. *Smith*, Willes, 327 ; 1 Chitty on Cont. [11th Am. ed.] 106 ; *Jackson* v. *Hart*, 12 Johns. 77 ; *Clark* v. *Wethey*, 19 Wend. 320 ; *Drew* v. *Swift*, 46 N. Y. 204 ; *Muldoon* v. *Deline*, 135 N. Y. 150 ; *McCluskey* v. *Cromwell*, 11 N. Y. 593 ; *Reynolds* v. *C. F. Ins. Co.*, 47 N. Y. 597 ; *Dwight* v. *G. L. Ins. Co.*, 103 N. Y. 341 ; *Humphreys* v. *N. Y., L. E. & W. R. R Co.*, 121 N. Y. 435.) Catharine's rights were not violated in 1835, and there was no resulting trust. (1 R. S. 727, §§ 45, 47 ; *Watkins* v. *Reynolds*, 123 N. Y. 211 ; *Stevenson* v. *Lesley*, 70 N. Y. 512 ; *O'Donoghue* v. *Boies*, 159 N. Y. 87 ; *Knowlton* v. *Atkins*, 134 N. Y. 313 ; *Campbell* v. *Stokes*, 142 N. Y. 23 ; *Matter of Brown*, 154 N. Y. 313 ; *Canfield* v. *Fallon*, 43 App. Div. 561 ; 161 N. Y. 623 ; *Bool* v. *Mix*, 17 Wend. 119 ; *A. F. Ins. Co.* v. *Bay*, 4 N. Y. 9 ; *Dyett* v. *C. T. Co.*, 140 N. Y. 54.) Had Catharine sued in 1835 to reform the conveyance on the ground of mistake, so as to take the estate in remainder away from her heirs and transfer it to herself, her bill would have been dismissed upon the ground that such relief would violate the equities of her children. (*Gleaves* v. *Paine*, 1 De G., J. & S. 87 ; *Anonymous*, 2 Ves. Sr. 671 ; *Oliver* v. *Oliver*, L. R. [10 Ch. Div.] 765 ; *Matter of Gowan*, L. R. [17 Ch. Div.] 778 ; 1 Daniel Ch. Pl. & Pr. 106 ; *Lady Elibank* v. *Montolieu*, 5 Ves. 737 ; *Murray* v. *Lord Elibank*, 10 Ves. 84 ; *Whittem* v. *Sawyer*, 1 Beav. 593 ; 13 Ves. 1 ; *Howard* v. *Moffatt*, 2 Johns. Ch. 206 ; *Kenny* v. *Udall*, 5 Johns. Ch. 464 ; *Matter of Walker*, L. & G. Ch. 299.) Defendants have failed to show any mistake in the transaction of 1835. (Pollock on Cont. 473, 474.) The plaintiffs can stand with entire confidence upon their rights under the transaction of 1827. (*Losey* v. *Stanley*, 147 N. Y. 560 ; *Davison* v. *De Freest*, 3 Sandf. Ch. 456 ; *Temple* v. *Hawley*, 1 Sandf. Ch. 153 ; Schouler on Husb. & Wife, § 162 ; 2 Seton on Decrees [5th ed.], 802 ; *Abraham* v. *Newcombe*, 12 Sim. 566 ; *Shipway* v. *Bell*, L. R. [16 Ch. Div.] 376 ; *Cushney* v. *Henry*, 4 Paige, 345 ; *Downing* v. *Marshall*, 23 N. Y. 366 ;

*Shapland* v. *Smith*, 1 Br. Ch. 75; *Jones* v. *Lord Say*, 1 Eq. Cas. Abr. 383; *Townshend* v. *Frommer*, 125 N. Y. 458.)

*Robert H. Elder* for respondents. A married woman at common law, as far as concerned her separate estate, was under no disability whatever; she was for all the purposes of her separate estate a *feme sole*. But her separate estate was only that which had been settled upon her so as to be free from the control of her husband, and it did not include her reversion after the death of her husband in real property in which her husband had or might have marital rights. (*Albany Fire Ins. Co.* v. *Bay*, 4 N. Y. 9; 1 R. S. [1st ed.] 758, § 10; *Jackson* v. *Holloway*, 7 Johns. 81; *Bool* v. *Mix*, 17 Wend. 129; 1 Bish. on Married Women, §§ 37, 39, 538, 539, 541.) The real estate of Catharine Russ, which was sold in 1826, under direction of the Court of Chancery, she being a minor, was not separate estate. (1 Bish. on Married Women, §§ 607, 645, 650; *Ellsworth* v. *Cook*, 8 Paige, 643; Code Civ. Pro. § 2359.) Both parties demanded direction of a verdict. An exception does not lie in such a case to the taking of the case from the jury, and if the judgment is fairly sustained by the evidence, it will not be reversed on appeal, though it was in fact a case for the jury. (*Smith* v. *Weston*, 159 N. Y. 194.)

LANDON, J. The trust provisions of the deed of 1827 of the York street property, and of the deed of 1835 of the Bridge street property are in the same words and in our opinion of the same legal effect. We think the rule in *Shelley's* case, which was abrogated by the Revised Statutes, January 1, 1830, did not apply to the deed of 1827, and, therefore, the deed of that date had the same meaning as the deed of 1835, which is to be construed under the Revised Statutes. The rule as stated in *Shelley's Case* (1 Coke Rep. 104) was: "When the ancestor by any gift or conveyance takes an estate of freehold and in the same gift or conveyance an estate is limited either mediately or immediately to his heirs in fee or in tail,

that always in such cases the *heirs* are words of limitation of the estate and not words of purchase " — thus giving the first grantee the entire estate, and nothing to his heirs. The same rule applied if the estate so given was an equitable one, but it did not apply if one estate was equitable and the other legal.

It will be observed that under the deed of 1827 Catharine Russ did not take an estate in freehold for her life ; her trustee took the estate, and she took but the equity to have the trust enforced, or an equitable estate, and that upon her death (her husband having meantime died) her right heirs took an estate of a different quality, namely, the premises and their rents, issues and profits forever, that is, a legal estate. An active trust was declared for the life of Mrs. Russ and for her benefit, a trust ordered by Chancery, and, therefore, one which Chancery would support and enforce. Thus, although the deed was in form a bargain and sale deed under the Statute of Uses, and the legal title, instead of a fiduciary estate, was in William Cornell, the bargainee, as the rule of law then was (see revisers' notes to part 2, chapter 1, R. S., section 50), yet Chancery would convert the use for the benefit of Mrs. Russ into a trust, and declare the bargainee to be a trustee, and enforce the trust, and thus vest an equitable life estate in Mrs. Russ, whether she were under coverture or not. (*Jackson* v. *Cary*, 16 Johns. 302.) But being under coverture, and the object of the trust being to protect her estate from the control of her husband, and secure it to herself and her heirs, this would most certainly be the case. (4 Kent's Com. 218, 230.) The trust as to the right heirs was also ordered by Chancery, and the deed was taken pursuant to its order ; but that trust was a formal or passive one, since the trustee had nothing to do, not even to convey to them, to protect or perfect their remainder, and, therefore, their remainder would in equity be treated as a legal estate. It was declared to be a legal estate by the retroactive and prospective declaration of the Revised Statutes. (1 R. S. 727, secs. 45, 46, 47 ; ib. 750, sec. 11.) " Formal trusts," said the revisers in their notes, " we propose to abolish by converting those which now

exist into legal estates, and prohibiting their creation in the future." But this was only making the long-established equitable rule a legal rule; it wrought no change in vested estates; the statute accomplished what equity would decree.

Thus Mrs. Russ had an equitable estate for life, and her right heirs took as purchasers the remainder in freehold. (4 Kent Com. 210, 211.) This diversity in quality of the estates given respectively to Mrs. Russ and to her right heirs would not permit the grant over to her right heirs to be construed as a limitation, that is, as descriptive of the inheritable quality of her estate, vesting the whole title in her, through her heirs forever, but required such gift over to be construed as a purchase, that is to say, the remainder was sold to her right heirs and not to herself, giving them the freehold estate in remainder precisely as the Revised Statutes now declare. (1 R. S. 725, sec. 28; *Vanderheyden* v. *Crandall*, 2 Denio, 9; *Striker* v. *Mott*, 28 N. Y. 82; *Smith* v. *Scholtz*, 68 N. Y. 41; *Schoonmaker* v. *Sheely*, 3 Denio, 485; 4 Kent Com. 247, 256.) *McWhorter* v. *Agnew* (6 Paige, 111) is not in point, because the equitable estate was granted to the wife for life with a general power of appointment. The right to the use of the whole for life, with right of disposition of the remainder, when fully executed could not be afterwards questioned, whether the rule in *Shelley's* case applied or not.

One method of conveyance, as stated in *Vanderheyden* v. *Crandall* (*supra*), was to convey the estate to trustees and their heirs in trust for the person who was to have its beneficial use for life, and upon a further trust to preserve the contingent limitations and with remainders over, thus preventing the several estates from merging. This precaution, says Chancellor Kent (4 Com. 258), is still used in settlements on marriage, or by will where there are contingent remainders to be protected. The legal estate remains in the trustees, subject to the trust, and the *cestui que trust* for life has only an equitable estate.

In ante-nuptial contracts, with a view to a subsequent settlement, the limitation of real estate to the husband and wife

for their lives and the life of the survivor, remainder to the heirs of the bodies of the parents, or to their "right heirs," made such heirs purchasers, otherwise the provision intended for such heirs might be defeated by the conveyance of their parents or of the trustee, a result which equity would not tolerate. (Bingham on Infancy and Coverture [Am. edition, 1828], 365 ; Story's Eq. sec. 983.) Much less, we may readily infer, would equity tolerate such a defeat when the chancellor himself had made the post-nuptial settlement with the intent to provide for the children.

We shall next consider whether any injustice was done to Mrs. Russ in either deed, so that a trust in the whole estate resulted in her favor.

When Catharine Cornell and John A. Russ intermarried in 1826 she was a minor, eighteen years of age. She was entitled, under the will of Nicholas R. Cowenhoven, deceased, to a one-seventh interest in certain real estate upon the death of her father, William Cornell, if she should survive him. That interest was, after her marriage, in proceedings duly had before the chancellor for the purpose, sold for $6,000 March 8, 1827. Contingencies might have arisen which, under the will of Cowenhoven, would have defeated her interest, but they never did arise. The proceeds were still real estate so far as the rights of husband and wife were concerned. (*Ellsworth* v. *Cook*, 8 Paige, 643.) If the proceeds were personal property then they would belong to the husband upon his reducing them to his possession. John A. Russ, by virtue of his marital rights, was entitled to all of his wife's personal property which he could reduce to his possession, and to the income and profits of his wife's real estate, and thus of its proceeds for their joint lives, and in case a child of the marriage should be born alive, until his own decease if he should survive her. (2 Kent's Com. 130.) But the proceeds were under the control of Chancery in the hands of the wife's father, William Cornell, whom the court had appointed her guardian to sell her interest and hold the proceeds subject to "such order as he (the chancellor) shall deem fit touching the invest-

ment and disposition of the proceeds." Thus the aid of the court was requisite to enable the husband to obtain possession of the wife's property, and thus the court was vested with the jurisdiction and power to make such an order respecting its disposition as should protect the wife's equities. (Story's Eq. sec. 1404; *Howard* v. *Moffatt*, 2 Johns. Ch. 206; *Dumond* v. *Magee*, 4 ib. 318; *Kenny* v. *Udall*, 5 ib. 464; *Udall* v. *Kenney*, 3 Cow. 590; *Mumford* v. *Murray*, 1 Paige, 620.) And this equity would be granted whoever might be the applicant to the court, the wife, her trustee or her husband. (*Ex parte Coysgame*, 1 Atk. 192; *Mealis* v. *Mealis*, cited in *Elibank* v. *Montolieu*, 5 Ves. 737, at p. 739.)

"The wife's equity to a reasonable provision out of her property for the support of herself and her children makes a distinguished figure in the modern Chancery cases which relate to the claims of the husband upon the property of his wife in action." (2 Kent's Com. 139.) "Where the husband seeks to recover his wife's property, and he has made no settlement upon her, he shall not have it without making a suitable settlement." (Story's Eq. sec. 64c.) That her children born or to be born of the marriage should be protected in these post-nuptial judicial settlements, as well as herself, appears by the cases last above cited and by abundant other authority. The court would assume as a matter of course that she was as anxious for her children as for herself, and that when she asked for herself she asked also for her children. When the court of its own motion interposed for her protection, it did so for her children also. (1 White & Tudor's Leading Cases in Equity [6th ed.], 516; 1 Daniel Ch. Pl. & Pr. 106; 2 Perry on Trusts, sec. 627; 2 Pomeroy Eq. Jur. sec. 1114; Smith's Manual Eq. 469; Adams' Eq. 47.) The equity rule was at first limited to the wife's personal property, but later was extended to her realty. (*Haviland* v. *Bloom*, 6 Johns. Ch. 178; Story's Eq. secs. 1406, 7, 8, 17, and cases there cited.) Naturally the provision for her children would come into force upon the death of both her husband and herself; that is to say, out of the reversion remaining in her after her husband's

death over which the marriage gave him no control. This reversion was her property, whether technically her separate estate or not. (*Albany Fire Ins. Co.* v. *Bay*, 4 N. Y. 9 ; 2 Black. Com. 433.) But she could not during coverture dispose of it by will (1 R. L. 365 ; 2 R. S. [2d ed.] 2, sec. 1), and until the decision by a divided court in 1850 of the case just cited, it was doubtful whether she could, without her husband joining with her, convey it. She certainly could not before the act of 1848, for the more effectual protection of married women, bar his right of tenancy by curtesy.

The defendants insist that the chancellor had no power to direct that this reversion be vested in her right heirs as a remainder upon the death of herself and husband, since it would be depriving her of her property without compensation, without her consent, she being an infant and incapable of consent, and also under coverture, which suspended her legal existence or incorporated it into that of her husband. (2 Black. Com. 433.) But her consent during her infancy was not necessary to the chancellor's jurisdiction. The fund was in court subject to his judicial disposal. The proceeding was not to deprive her of her estate, but to confirm her equities in it. Her consent would be necessary to a deprivation but not to a confirmation of her equities. She was competent to marry, and had married, and thus had conferred upon her husband, notwithstanding her infancy, his marital rights over her property and had suspended her own. The chancellor could not and would not surrender control of her property without requiring her husband to do equity, that is, to make suitable provision for her and her children. To do this he first ascertained by means of a reference all the material facts, and then made his order. Thus he supplied to the infant his ripe judgment and sound discretion and protected her from any prejudice from her own incompetency and disability. The whole matter was within his judicial discretion. (Smith's Manual Eq. 469.) The wife and her interests were bound by his order. (*Cahill* v. *Cahill*, L. R. [8 App. Cases] 420.) The chancellor's jurisdiction did not proceed from the consent of the wife, but from his power in

equity under the circumstances over the husband's legal rights, and his corresponding duty to protect the wife's equity. That he did in fact protect her equities admits of no dispute. Instead of allowing her husband to have the custody and income of it during her life, he never gave him the custody, but gave it to her trustee and the income to her. He allowed the husband nothing, except such as his possible tenancy by the curtesy might give him if he should survive her; he directed that the remainder upon the death of both husband and wife should go to her right heirs. Thus her husband's heirs other than her children by him were excluded. Her children surviving her and the children surviving her of any child who should predecease her would be her right heirs. "Right heirs" is a term formerly in use in the creation of estates tail to distinguish the preferred to whom the estate was limited from the heirs in general, to whom upon failure of the preferred heir and his line the remainder over was usually finally limited. With the abolition of estates tail the term has fallen into disuse. If no preference was made among the heirs, it would not import any, and, therefore, it here means the same as the single word "heirs." The chancellor used it in that sense no doubt, intending thereby the children of Mrs. Russ surviving her, or the children of any child who should predecease her. Of course it was possible that she might leave no issue, and then her collateral heirs would take. This event has not occurred, and we need not inquire into the hypothetical rights of such collaterals. The chancellor did provide for Mrs. Russ and her children and the children of such child as predeceased her, and this was within his jurisdiction. The result was, as the event shows, that none of these premises or their income came to the hands of the husband. The only possible ground of complaint is that the reversion was not reserved to Mrs. Russ. But it was not reserved because in making provision for the wife and her children there was nothing else left for the children after giving the wife an estate for life; provision had to be made for them. Her husband's right as tenant in curtesy initiate could not be taken

from him. ( *Wickes* v. *Clarke*, 8 Paige, 161.) The wife was not deprived of her reversion; she was allowed an ample equivalent for it. Moreover it may well be that the husband would have insisted upon more and have obtained it if this provision for the children had not been made. (*Edwards* v. *Countess of Warwick*, 2 P. Wms. 171.) If at any time afterwards, notwithstanding her infancy or coverture, she had supposed that she was too greatly prejudiced by the settlement, either by the improvident order of the chancellor, the mistake of the scrivener who drew the deed of 1827, or by the fraud, actual or constructive, of any actor in the proceeding, she could have invoked Chancery to amend the settlement. One of the powers inherent in Chancery is the protection of infants and their estates. (*Anderson* v. *Mather*, 44 N. Y. 249.) And, also, before the modern bestowal of separate legal rights upon married women, the protection of their separate equitable estates. (*Temple* v. *Hawley*, 1 Sandf. Ch. 153.) This for the reason that if Chancery had made a mistake or an improvident order in the disposition of a married woman's equities in her own estate, it was willing in a proper action, rehearing or proceeding for the purpose, to correct it, if it was still practicable to do so. It is obvious that she could not by her mere disaffirmance upon attaining her majority invalidate the order and settlement, since both had proceeded from the court. The order was a final one. It lacked no essential of finality either in jurisdiction, power or regularity. Ante-nuptial settlements are different. They rest upon contract, and an infant's contract is voidable. (*Jones* v. *Butler*, 30 Barb. 641; *Temple* v. *Hawley*, *supra*.) In post-judicial settlements of the wife's property, of which the court had the custody, the only instance in which the wife's consent was necessary was to waive her equities in favor of her husband. (Story's Eq. 1418.) She could waive all or part, and could, therefore, consent to the disposition made by the chancellor in her husband's favor against herself. The absence of a waiver of her equities in favor of her husband would be a sufficient basis for a settlement by the court in favor of herself and her children, and

thus no evidence of her consent to the latter settlement would be necessary. (*Glen* v. *Fisher*, 6 Johns. Ch. 33.) We need not, therefore, seek for affirmative evidence of the wife's consent. When she was an infant the court protected her equities. By virtue of the deed of 1827 she had a separate equitable estate for life in the York street premises, and when she attained her majority she could upon a separate examination apart from her husband unite with her trustee and with her husband in conveying it under permission of the Court of Chancery. (*Albany Fire Ins. Co.* v. *Bay, supra.*) If she could unite with them she could refuse to do so. So with respect to the purchase of the Bridge street premises. She was thus dealing with her separate estate as to which in equity her powers, to the extent that Chancery had defined them, were the same as if she were a *feme sole.* We thus have her ultimate consent to the Bridge street deed. Thereafter and until 1866 she was in possession of the Bridge street premises. She could convey to her son, John A. Russ, Jr., no greater estate than she had. Thus until her death in 1894 she had the benefit of the transaction without making complaint.

In 1852 she obtained a judgment of absolute divorce against her husband, which by its terms transferred to her his interest in the premises. She never asserted any disability of coverture, and if, as we do not think, it held the validity of either deed in suspense, it was removed. By the act of 1849, ch. 375, amending ch. 200 of the Laws of 1848, " for the more effectual protection of married women," the trustee could on her request and with the approval of a justice of the Supreme Court, convey to her whatever he held as trustee for her, but nothing more. He did make such conveyance, and presumably she was content with it. She did nothing and could do nothing to defeat the interests of her right heirs, as settled in the deed of 1835. (*Neves* v. *Scott*, 9 How. [U. S.] 196.)

Ulmer C. Russ, her son, predeceased her, and, therefore, never became her heir, and his deed to John A. Russ, Jr., simply conveyed his expectancy, which failed by his death.

When she died in 1894, the plaintiffs as her right heirs,

and, therefore, under the deed of 1835 purchasers of one-third of the Bridge street premises, were entitled to the possession thereof.

The judgment should be reversed, new trial granted, costs to abide the event.

GRAY, J. (dissenting).    I must dissent from the conclusion reached in this case by my brother LANDON.    The deed of 1827 from Tallman to Cornell, which created the trust for Catharine Russ, was, unquestionably, understood to be within the operation of the rule in *Shelley's* case.    She had, while a minor, received the land as devisee under her grandfather's will and, after her marriage, pursuant to an order of the chancellor, in proceedings had to that end, which appointed William Cornell as her guardian for the purpose, it was sold and a portion of the proceeds was invested in Brooklyn real estate. The title need not have been taken by her guardian to himself as trustee ; but it was, and to preserve it from the control, or obligations, of her husband, a trust was created for Catharine's life, with the provision that "from and after the death of the said Catharine Russ, living the said John A. Russ, her husband, then upon trust to pay such rents, issues and profits to the said John A. Russ during his natural life, and from and after the death of said John A. Russ in case he survives the said Catharine, and also from and after the death of the said Catharine, whether the said John A. Russ be then living or dead, to have and to hold the same premises and the rents, issues and profits thereof in trust to and for the sole use, benefit and behoof of the right heirs of the said Catharine Russ, to them, their heirs and assigns forever."    I think the case falls within Mr. Preston's definition of the rule in *Shelley's* case : "When a person takes an estate of freehold, legally or equitably, under a deed, will or other writing, and in the same instrument there is a limitation by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality, to his heirs, or heirs of his body, as a class of persons to take in succession,

from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate." (From Kent's Com. vol. IV, *215, and see 2 Washburn Real Prop. *271.) The case of *Mc Whorter* v. *Agnew*, (6 Paige, 111), illustrates the application of the rule. When, in 1835, the trustee was ordered by the chancellor to sell the real estate and to purchase the property now in suit, upon the joint petition of Catharine, her husband and her trustee, which prayed that the new conveyance might be taken by the trustee "upon the like trusts as were expressed and declared in and by the original trust conveyance hereinbefore mentioned from Ebenezer Tallman to William Cornell," the intention, clearly, was to continue the estate as it was. The provision of the Revised Statutes, under which the rule in *Shelley's* case ceased to be operative, was not retroactive upon estates settled theretofore. The estate remained unaffected and the only purpose of the parties was to substitute one piece of property for another, as an investment by the trustee. This view of the intentions and acts of the chancellor and of the parties is reinforced by a consideration of the action of the Supreme Court in 1856. After Catharine's divorce from her husband, by a decree which extinguished his interest in the real estate, as a provision for alimony, her trustee petitioned for leave to convey the premises to her, setting out the terms of the deed of trust and alleging that its purpose was to protect the property from the control of her husband, that no one except she and her heirs at law had any beneficial interest in the estate and that she had always " enjoyed the use, rents and profits of the said real estate." The Supreme Court, thereupon, and after inquiry through a referee, decreed the conveyance by the trustee and it was made ; whereupon, subsequently, being in possession, she conveyed to her son, through which conveyance these defendants derive their title. As it was observed in the opinion below, " the several courts which dealt with the matter, and all the parties concerned, have acted throughout on the assumption that the heirs of Catharine Russ had never acquired any remainder, or other interest, in the trust

16

property." It was because of that assumption that the purchaser, in 1835, took his deed from the trustee and Mr. and Mrs. Russ, as sole grantors, and that the court, in 1856, directed the trustee to convey to Mrs. Russ. When the trust created by the deed of 1827 was released from the interest of the husband, Mrs. Russ became entitled to have again her estate and to dispose of it as she did. The construction given to the deed of 1827 makes it harmonize with the circumstances and with the rule of the common law, which then obtained and in view of which the courts may be deemed to have acted.

For these reasons, briefly, as for those advanced in the opinion at the Appellate Division, I am of the opinion that the judgment below was right and should be affirmed.

PARKER, Ch. J., O'BRIEN and WERNER, JJ., concur with LANDON, J.; GRAY, J., reads for affirmance; MARTIN, J., not voting; CULLEN, J., not sitting.

Judgment reversed, etc.