# SLATER v. RUDDERFORTH.

RULE IN SHELLEY'S CASE; WILLS; INFANTS.

1. The rule in *Shelley's Case* does not apply where one of the estates sought to be carved out is equitable and the other is legal. (Following *Sims* v. *Georgetown College*, 1 App. D. C. 72.)

2. By a devise of land to a trustee in trust until the *cestui que trust*, a female, shall attain the age of sixteen years, when she shall be permitted to have and to hold and to enjoy the property, and to take the rents and profits, for her life, with remainder in fee to ner lawfull issue, there vests in the *cestui que trust* a life estate only, while her children take an estate in fee simple in remainder.

3. Such a trust for a married woman is not a passive but an active trust, to which the rule in *Shelley's Case* does not apply; nor under the statute of 27 Hen. VIII. chap. 10, will the donee of the life estate be regarded as taking a legal title, on the theory that her equitable estate is a passive, and not an active, trust. (Following *De Vaughn* v. *De Vaughn*, 3 App. D. C. 50; *Frey* v. *Allen*, 9 App. D. C. 400, and *Fields* v. *Gwynn*, 19 App. D. C. 99.)

4. A conveyance of real estate by a minor may be disavowed by him upon his coming of age, and the institution by him of a suit for the cancelation of the conveyance is a sufficient disavowal.

5. Where a party procures a life tenant of real estate, to whom he has paid a small consideration, and her children, who are entitled to the remainder in fee, to convey the property to another who, in turn and

without consideration, conveys to the first person's wife, who holds it for his benefit, the wife, even in the absence of a showing of misrepresentation, will be assumed to hold the property as trustee for the children, and be required to reconvey to them.

No. 1493.   Submitted April 15, 1905.   Decided May 2, 1905.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia in a suit to vacate a deed as having been fraudulently obtained.        *Affirmed.*

The COURT in the opinion stated the case as follows:

This is a suit in equity instituted in the supreme court of the District by the appellees, Thomas H. Rudderforth, Frank W. Rudderforth, an infant, by his next friend, William H. Mullen, Daisy B. Palmer, Emma F. Thomas, and Mary Grace Mullen, as complainants against the appellants, Mattie R. Slater and John G. Slater, and three other persons who were brought in by amendment, as defendants, for the cancelation of certain deeds, whereby the appellant Mattie R. Slater, through the procurement of her husband, the coappellant John G. Slater, had become possessed of certain real estate in the city of Washington, and for the reconveyance and delivery of said real estate to the complainants as the true and lawful owners thereof.

It appears from the record that on and before the 28th day of May, A. D. 1898, the appellees and their mother, Emma F. Rudderforth, subsequently deceased, were the owners of the property in question, and in possession of it under the will of one William Mockabee, of which will the clause which conveyed the said property to them, and which is important in these proceedings, is in the following words:

"I give and devise to my friend Ammon Green, of the city of Washington in the District of Columbia, and to his heirs and assigns, the following described part of lot of ground numbered three (3) of Berry and Mohun's subdivision of square of ground numbered seven hundred and seventeen (717) situate, lying, and being in the said city of Washington, to wit:   Be-

ginning for said part of the said lot of ground at the southwest corner of said lot and running thence north with the line of First street east, 15 feet; thence east 53 feet, 10½ inches, thence southwestwardly 15 feet and 1 inch, and thence westerly to the place of beginning.

"To have and to hold the said part of said lot of ground and premises, together with the buildings and improvements thereon, unto the said Ammon Green, his heirs and assigns, upon the trusts and confidence hereinafter named, and none other. That is to say, in trust to receive and collect the rents thereof and apply the same towards the payment of my said debts, funeral expenses, the legacy hereinbefore bequeathed, and the maintenance and support of my son, William H. C. Mockabee, until Emma Smitson, who during the lifetime of my late wife was an inmate of my house, and is now about seven years of age, shall attain to the age of sixteen years; and upon the further trust, in case the said Emma Smitson shall live to attain to the said age of sixteen years, to suffer and permit her, the said Emma, to have, hold, use, occupy, possess, and enjoy the said part of said lot of ground and premises and the rents, issues, and profits thereof to have, take, receive, and apply to her own sole and separate use, any coverture notwithstanding, for and during the term of her natural life; and upon the further trust and confidence, in case the said Emma after attaining to the age of sixteen years shall die leaving lawful issue, to convey the said part of said lot of ground and premises by a good and sufficient deed to such lawful issue, his, her, or their heirs and assigns; and also upon the further trust and confidence, in case the said Emma shall die, either before or after attaining to the age of sixteen years, without leaving lawful issue surviving her, to convey the said part of said lot of ground and premises by a good and sufficient deed unto my said son, William H. C. Mockabee, his heirs and assigns."

This will was executed in 1859, and upon the death of the testator very soon afterwards was admitted to probate in the same year. Emma Smitson lived to enjoy the devise in her favor, became by marriage Mrs. Emma F. Rudderforth, and

died on February 15, 1902, leaving as her lawful issue surviving her five children, who are the complainants in this case and the appellees here.

On or about May 28, 1898, Mrs. Emma F. Rudderforth was approached by the appellant, John G. Slater, and as it is alleged in the bill of complaint, was induced by false and fraudulent representation on his part, which, however, he denies, to make a conveyance to him of the said property, which is stated to have been worth the sum of about $1,500, for the grossly inadequate sum of $150, and the settlement of some taxes in arrears. The allegation is that it was represented to her by Slater that, by the accumulation of taxes, she was in danger of losing the property and being turned out of it; and also that there was a judgment of a justice of the peace against her, which was about to be enforced against the property. Thereupon, and, as it is alleged, in pursuance of these representations, Mrs. Emma F. Rudderforth executed the required deed of conveyance, not directly to Slater, but to another person, who in turn conveyed to a third person, who in his turn conveyed to Mrs. Mattie R. Slater. All these subsequent conveyances were wholly without consideration, and there is scarcely a pretense that they were not all for the use and benefit of John G. Slater.

Slater, however, was not satisfied with the deed from Mrs: Emma F. Rudderforth. Upon the pretense, as alleged, that a conveyance from her children also was necessary, although he stated that they had no interest in the property and that the deed from them was a mere formality, they were induced to join in the conveyance with their mother. The sum of $150 was paid to the mother, but no one of the children received anything; and as to them the conveyance was wholly without consideration of any kind. Only two of the children were then of age, three of them were under age, and one of the three was only sixteen years old. The fact of this minority seems to have been well known to Slater, and it appears that he asked one, at least, of the minor children whether he would not ratify the deed after he became of age, and that the boy answered that he would do so.

By an instrument of writing under seal, recorded among the land records of the District, on June 25, 1901, the appellees joined in a deed disavowing and repudiating their deed of conveyance; and on February 15, 1902, Mrs. Emma F. Rudderforth died. Thereupon, on November 26, 1902, the appellees instituted the present proceedings to enforce their rights to the property. One of the complainants, Frank W. Rudderforth, was yet a minor, and he sued by next friend. He became of age, however, on May 25, 1903. All the complainants, it may be noted, seem to have been in very humble circumstances, and not very intelligent as to their rights.

The defendants answered the bill of complaint, and, after testimony taken and hearing had, the court decreed in favor of the complainants, and in accordance with the prayer of their bill, and two of the five defendants, being those only who are substantially interested in the controversy, have appealed to this court.

*Mr. F. Edward Mitchell, Mr. O. B. Hallam,* and *Mr. W. M. Hallam* for the appellants.

*Mr. W. Walton Edwards* and *Mr. Creed M. Fulton* for the appellees.

Mr. Justice MORRIS delivered the opinion of the Court:

Upon full consideration of the record before us, and of the briefs and arguments of counsel, we find no reason to come to any different conclusion from that reached by the learned justice who sat in the court below, and we might well adopt as our own the very able and satisfactory opinion rendered by him in the cause.* In view of that opinion we will content ourselves with a few brief observations.

---

*The opinion of the lower court was delivered by Mr. Justice GOULD, of that court, and was as follows:

The original bill in this case was filed November 26, 1902, by Thomas H. Rudderforth and four others, as the only children and heirs at law of

1. That Emma Smitson, afterwards Emma F. Rudderforth, took only a life estate, and not an estate in fee simple under the rule in *Shelly's Case*, in the property here in controversy, and

---

Emma F. Rudderforth, deceased, against Mattie R. Slater and John G. Slater, her husband. The plaintiffs allege that they are adults, excepting Frank W. Rudderforth, who sues by next friend, and were given by the will of one William Mocabee, deceased, a fee-simple title in premises known as 815 First street, northeast, in this city (which is further described by metes and bounds), subject to the life estate of their mother, the said Emma F. Rudderforth, who died February 15, 1902. A duly certified copy of the said will is filed with the bill, whereby it appears that the said Emma F. Rudderforth had an equitable life estate in said premises (if she reached the age of sixteen) and that her lawful issue had the equitable remainder in fee, the legal title being vested by the will in one Ammon Green. The bill further alleges that Emma F. Rudderforth took possession of said property when she was about eighteen years of age, and occupied the same as her home for about thirty years, until May 28, 1898, when defendant John G. Slater approached her, she being then a widow, and stated to her that he had bought the property at tax sale and had title thereto, and that she would have to vacate the same; that the overdue taxes amounted to about $800; that a certain Skidmore had obtained a judgment against her and would shortly sell the property and put her out of possession; that by such false and fraudulent representations she was greatly worried and distressed, and that Slater, taking advantage of her condition and lack of information and inexperience, offered her the sum of $200 for a conveyance of her interest in the property, stating that if she would vacate at once he, Slater, would not require her to pay rent for the current month; that relying upon these representations she accepted his proposition.

The bill goes on to allege that when the said Emma F. Rudderforth went to Slater's office to execute a deed of the property, Slater required her to bring all her children (the complainants), to join with her in the deed, saying that it was a formality; that accordingly on May 28, 1898, the complainants all united with their mother in a deed which they supposed conveyed the property to Slater, but which in fact conveyed it to Malcolm Hufty, a lawyer. Slater paid Mrs. Rudderforth $150, reserving $50 to pay the judgment against her. Subsequently Hufty conveyed the property to Cotter T. Bride, who, on July 18, 1900, conveyed to Mattie R. Slater. Both these deeds are alleged to be without consideration. The bill further alleged that, at the time the deed was executed, three of the plaintiffs were infants; they aver that they did not read the deed, nor was it read to them; that they were wholly without information as to their rights in the matter; that their signatures were obtained by Slater by misrepresentation, fraud, and deceit "in that he knew what rights they had in the prop-

that upon her death the appellees, as her issue surviving her, took an estate in fee simple in remainder, we regard as too clear to be a subject of controversy.    Under the will of William

erty, but did not reveal it to them, and, on the contrary, persuaded them to believe they had no interests  or rights" therein; that by reason of such fraud they were induced to part with their property, which they aver to be reasonably worth $1,500; that Slater's statement as to the taxes was false, the record disclosing that said property was sold for taxes April, 1896, for taxes for 1895, amounting to $9.41, and was purchased by said Slater, as trustee, and by him assigned to one Marshall M. Gilliam, who obtained a tax deed for the same and recorded it a few days before the transaction of May 28, 1898.

The bill prays  that the deeds above described be set aside; that title be decreed to be in the complainants; and that Slater account for the rents, the complainants tendering themselves ready to pay all amounts expended by defendants for repairs and for the acquisition and protection of said property, including the amount paid to Emma F. Rudderforth.

There was an amendment to the bill, making certain subsequent encumbrancers parties defendant; but, as this encumbrance has been released, this feature of the case need not be considered.

The defendants filed a joint answer in which they give the following version of the transaction:    That John G. Slater, acting as the agent of his wife, called upon Emma Rudderforth to purchase the property in controversy; that it was then subject to taxes from 1880 to 1896; that at the 1896 sale it had been bought in by Slater for the taxes of 1895, who assigned certificate to one Belvin, to be held by him subject to Slater's orders, but who transferred it without Slater's knowledge to one Gilliam, who obtained a deed from the District, of which facts defendants were ignorant at the time of the negotiations for said property; that the said property was again sold for the taxes of 1896 in 1897, and was bought in by a son of defendants for the benefit of Mrs. Slater, who now holds the certificate and is entitled to a deed thereunder.    The answer further admits that at the time of the negotiations one Skidmore had obtained a judgment against the said Emma F. Rudderforth, "and that the said Skidmore had threatened to seize her interest in said property to satisfy the same, and that as part of the consideration for the purchase of the said property defendants paid and satisfied said judgment."    Defendants further deny they made any false representations to the said Emma Rudderforth, but that John G. Slater, acting as agent of his wife, "offered the said Emma F. Rudderforth the sum of $200 for the interest of herself and children, and that the said offer was accepted;" that each of the said complainants understood they were selling their interest in said property; "because of their inability to clear up the title, pay the taxes, etc.; and that, although some of the said children were minors, defend-

Mockabee she had only an equitable estate, while a legal estate in fee simple was given to her issue; and it is well-settled law, indeed it is elementary law, that the rule in *Shelley's Case* does

ants were willing to take their interests subject to their ratification or avoidance of the same." They admit that the property was conveyed to Hufty, and subsequently to Bride, because each advanced money to defendants. They allege the representations made to Mrs. Rudderforth as to twenty years' taxes being unpaid, and that John G. Slater had purchased the same at tax sales, were true. They allege the value of the property to be not more than $800, and that it rents for $8.30 per month. It further appears that the assignment of said judgment was made to Malcolm Hufty, May 2, 1898.

By a petition filed in the case of Mattie R. Slater, July 23, 1903, it appears that she has received an offer of $2,900 from the Washington Terminal Company for said property.

The testimony in the case is exceedingly voluminous, and much of it entirely irrelevant to the issue. Daisy B. Palmer, one of the complainants, testifies that she was present at the interview between Slater and her mother, and that he told her that the property was eaten up with taxes; that Skidmore was pushing to collect his judgment and that, unless she took the $150 he (Slater) offered, the house would be taken from her. She further testifies that she and the other children did not know that they had any interest in the property and received no part of the purchase money; that Slater did not state what their interest was, but that, when they signed the deed at his office, her sister, Mrs. Mullen, asked Slater to let her look at the paper, and he answered that their signing was a mere matter of form. Three of the other complainants corroborate her as to the request of Mrs. Mullen, their lack of knowledge of their interests, and the nonreceipt of any part of the purchase money. Further testimony was offered by complainants to the effect that three of the children were infants when they signed the deed, and that none of them had authorized their mother to act for them. Mr. Doyle, an experienced real-estate man, testified that the property was worth $1,500, in 1898, and that the Washington Terminal Company had offered Mrs. Slater $2,900 for it since the suit was instituted. Mr. Leipold testified to the rent collected for Slater at $8.30 per month since the deed was obtained from Mrs. Rudderforth and complainants.

For the defendant, the material witnesses were Mr. Slater's son, who swore that he was present in his father's office when the deed was signed, and that his father read it to the plaintiffs, but that he did not hear his father tell plaintiffs what interest they had in the property; Mr. Fickling, who said that if he "was buying the property and there was no chance of his disposing of it, I don't think I would give more than $600 or $700 for it;" and Mr. John G. Slater's version of the transaction

not apply where one of the estates sought to be carved out is equitable and the other is legal. *Sims* v. *Georgetown College,* 1 App. D. C. 72, and cases there cited. It is sought to avoid

is as follows: He went to Mrs. Rudderforth in May, 1898, having secured the assignment of a judgment for $53 and costs against her, to a dummy, who held it for him, and represented that there were about twenty years' taxes due on this property, the total amount of which he didn't know until after the deed was signed, and offered her $150 in cash, and the judgment for the property. He says (p. 34) : "I either told her that I had that judgment or would pay that judgment and give it to her and this $150" for this property, subject to taxes.

"*Q.* State whether or not anything was said about the interest of Mrs. Rudderforth's children in the negotiations? *A.* Well, I knew that the property belonged to them at her death, and they knew that the property belonged to them at her death.

> *       *       *       *       *       *       *       *       *       *       *       *

"*Q.* How are you able to testify as to that; just tell us that? *A.* Because of the fact I told them that the interest belonged to them at the death of the mother, and they said they knew it too.

> *       *       *       *       *       *       *       *       *       *       *       *       *

"I told Mrs. Rudderforth I had bought it in for taxes and there was twenty years' taxes on it * * *" (p. 36.)

"I read them the deed and told them the contents of the deed, and told them of their heirship, and they stated they knew it. I asked them if they were willing for the transaction, and they said they were. They wanted their mother to get the money." (p. 37.)

On cross-examination, he stated that he was dealing extensively in tax titles at that time; that he cannot remember what he gave for the Skidmore judgment; that he has never had the said judgment satisfied on the books of the justice of the peace.

As to the payments, the following is instructive:

"*Q.* Can you state the amounts, if any, you were to pay for the other children's respective interests in this property to their mother, for them respectively? *A.* I don't know. Because she might have lived a long time —longer than all of them, and the whole of it might have been hers.

"*Q.* Then if I understand your answer you had no agreement with any one of these complainants to pay him or her any particular sum of money for his or her interest in this property? *A.* I had an agreement to pay them all $150 in cash and give them that judgment, and they were to divide it to satisfy themselves, and they all said, give it to the mother."

He further testifies that he settled the back taxes by paying Mr. Gilliam $125; that he knew when he visited Mrs. Rudderforth in May, 1898, that he could get the twenty years' arrears of taxes canceled.

the operation of this doctrine on the ground that the equitable
estate to Emma F. Rudderforth, as it is claimed, was a passive,
and not an active, trust, and therefore that, under the statute of

---

From the pleadings and testimony in the case, the situation presented
is substantially as follows: The defendant Slater, a man experienced in
dealing in tax titles and securing cancelation of back taxes, ascertained
that the property in question was subject to taxes from 1880 down to
1896. In the latter year he bought it in for the taxes of the preceding
year, assigning the certificate of purchase to one Belvin, who furnished
the money and with whom he had an agreement to divide profits arising
out of this and similar transactions. The holder of this certificate would
be entitled to a deed in two years, *i. e.*, in April or May, 1898. The
grantee in that deed could, as the law then stood, obtain a cancelation
of all back taxes. For this purchase he paid between $9 and $10. Before
making it, he ascertained that there was a large arrearage of taxes on
the lot, and this was the incentive to its purchase at the sale aforesaid.
Next, Slater ascertained that a grocer, named Skidmore, had a judg-
ment of $53 and costs against Mrs. Rudderforth, the holder of a life
estate in and the possession of said property. This he purchased
several weeks before visiting her, for an amount which he cannot remem-
ber, and has it likewise assigned to a dummy for his (Slater's) use. Thus
equipped, he visits Mrs. Rudderforth, who was a widow, illiterate (she
signed the deed by making her mark), with five children, three of whom
were infants, and in needy circumstances. Just what transpired at that
interview may admit of debate. Mrs. Rudderforth's daughter, who was
present, says that Slater told her that the property was eaten up with
taxes, that Skidmore was pushing to collect his judgment and that, unless
she took the $150, the house would be taken from her. Slater says he
told Mrs. Rudderforth that he had bought the property for taxes and
there was twenty years' taxes on it; that he either told her he had the
judgment or would pay the judgment and give her $150 besides. He says
he did not then know what the back taxes amounted to, nor did that
make any difference to him, because with the deed he thought he con-
trolled he could cancel whatever amount might exist. If he did not
know the amount of such back taxes, it is reasonable to presume that
he represented to Mrs. Rudderforth that such taxes, together with the
Skidmore judgment and the $150, represented the full value of the prop-
erty, which was palpably untrue, as the back taxes did not exceed $450,
and the property, according to the weight of the testimony, was worth at
least $1,200. It does not appear that he had any negotiations with the
plaintiffs as to the price at which they would sell. Indeed the only testi-
mony that they knew they had any interest in the property is Slater's
statement that, at the time the deed was executed, he told them of "their
heirship," and in this he is not supported by his son, who was present,

27 Henry VIII. chap. 10, the donee of the life estate must be regarded as taking a legal title. But the law is directly the reverse of this, and we have so held. *Frey* v. *Allen,* 9 App. D.

and is flatly contradicted by four of the complainants. There is no dispute that no one of the complainants received one cent of the consideration, or that any agreement was made whereby they, or any of them, were to get any part of it. In fact three of them were incapable, in law, of making a valid deed or contract, or of authorizing one to be made for them.

Should a court of equity put the seal of its approval on a deed obtained under such circumstances?

It is insisted by counsel for defendants: (1) That mere inadequacy of consideration, unless extremely gross, does not prove fraud; (2) that the vendee is not bound to disclose knowledge to vendor where facts are equally accessible to both; and (3) that as the bill charges actual fraud, that not having been proved, the court cannot grant relief for mere inadequacy of consideration.

These three propositions may be accepted as generally true; but I cannot apply them to the facts of this case. Where the parties are both in a situation to form an independent judgment concerning the transaction, and acted knowingly and intelligently, mere inadequacy of consideration, unaccompanied by other inequitable incidents, is not ordinarily of itself a sufficient ground for canceling an executory or executed contract. But where inadequacy is accompanied by other inequitable incidents, such as undue advantage or oppression on the part of the one who obtains the benefit, or ignorance, pecuniary necessities, and the like on the part of the other, these circumstances, combined with inadequacy of price, afford ground for relief in equity; or, at least, they throw the burden of proof upon the party claiming the benefits of the transaction of showing that the other acted voluntarily, knowingly, intentionally, and deliberately, and that his consent was not obtained by oppression or undue advantage taken of his condition, situation, or necessities.

Anson on Contracts, 4th ed. 169, lays down the rule substantially, as follows: In the case of dealings with persons under pressure of necessity or distress, without adequate protection, the court will look, not merely to the acts of the parties, but to the reasonableness of the transaction under all the circumstances of the case, and, if it appears that one has taken advantage of the unprotected situation of the other to drive a hard bargain, the transaction will not be allowed to stand. This rule is often applied to expectant heirs, reversioners, and holders of other expectant interests. If a man takes advantage of the present poverty or imagined distress of the owner of an expectant interest to purchase that interest for an inadequate price, equity will afford relief. But, it is also claimed that as the bill charges fraud which had not been proved the court cannot grant relief for mere inadequacy of consideration. In other

C. 400; *Fields* v. *Gwynn,* 19 App. D. C. 99; *Brown* v. *Wadsworth,* 168 N. Y. 232, 61 N. E. 250; 4 Kent, Com. p. 218; *De Vaughn* v. *De Vaughn,* 3 App. D. C. 50. A trust of this kind for a married woman is not a passive, but an active, trust, to which the rule in *Shelley's Case* does not apply. The appellees therefore took a legal estate in fee simple in remainder.

2. The conveyance from the appellees to the appellants was wholly without consideration; and it is impossible, under the circumstances, to believe that it was not superinduced by misrepresentation of some kind, whether intentional or unintentional. In any event it is void as to two of the three minors who executed it, for they had the right to disavow and repudiate it

---

words, that the allegations and the proof do not correspond. While the bill in this case is crude and inartificially drawn, it does allege that by reason of the actions of Slater the complainants were induced to part with their property for an inadequate consideration; that Slater failed to inform them as to their rights in the matter, of which they were ignorant, and that, at the time they parted with their rights in the property, at least three of them were infants, and all of them had a mere expectancy. Without going fully into the allegations of the bill, I feel satisfied that it is broad enough to sustain the proof that was offered.

While in my judgment these principles are sufficient to dispose of the case, there is another view of it which leads to the same conclusion. I cannot find, from the evidence, that these plaintiffs ever received one cent for this property, or that they ever authorized their mother to receive one cent for them or for any of them. So far as they were concerned the consideration is not merely inadequate, but is wholly wanting. Slater testifies, in effect, that he made no bargain with them or with any one of them; that he paid no part of the consideration to them or to any one of them, and, as I have said, he fails to show that their mother had any authority to contract for their interests, or to receive any part of the purchase money in payment therefor. Of course the judgment which was included in the purchase price was not against them nor against their interest in the property; and all the testimony is to the effect that the balance of $150 was paid directly to the mother.

For the reasons above given I will sign a decree setting aside the deeds and vesting the title in these plaintiffs, and the case will be referred to the auditor to state an account between the parties, in which Slater will be charged with all the income he has received from the property since the death of the life tenant, Emma F. Rudderforth, and credited with all necessary expenditures in the shape of taxes, repairs, etc., affecting the same.

upon coming of age, and they have exercised that right. As to the third and youngest child, it is claimed that he cannot repudiate the act until he reaches his majority. But he has reached his majority, and it is sufficient evidence of repudiation on his part that he continues to prosecute this suit. A more definite act of disavowal can scarcely be supposed.

3. Even in the absence of misrepresentation, inasmuch as the conveyance by the appellees was wholly without consideration, it would have to be assumed, unless good reason to the contrary were shown, which certainly has not been shown here, that the appellants held the property as trustees for the appellees, and that they should reconvey to them.

---

In this connection there is also submitted to me without argument equity case No. 24,024, in which the same complainants file a bill against John G. Slater and Alice F. Slater, his daughter, to set aside a tax deed affecting the same property. This tax deed is based upon the certificate obtained in 1896 by John G. Slater, trustee; by him assigned to one Belvin, and by him assigned to Gilliam, who obtained a deed from the commissioners dated May 20, 1898. This is the same sale testified to in the case number 23,636. Gilliam afterwards conveyed the property to one Rawlings, who by deed dated May 15, 1903, and recorded June 12, 1903, conveyed said property to defendant Alice F. Slater, who was, as I have said, the daughter of John G. Slater. The tax deed is the one used by Slater to secure a cancelation of the back taxes from 1880, as appears from his testimony in the first case. The tax deed is attacked on a number of grounds. In my judgment the sale under which it was obtained is absolutely void for two principal reasons: (1) Because the property was not assessed in the name of the rightful owner; and (2) because the description in the advertisement of the sale is hopelessly defective, and cannot be identified with the property in the suit, either of which reasons would be sufficient for setting it aside.

The question arises, upon what terms it should be set aside. Ordinarily the complainants would be required to pay nothing more than the taxes for which the property was sold, as a condition of having the invalid sale set aside; but it appears in this case that Slater, by reason of his possession, through his daughter, of the title under this deed, was enabled to secure a cancelation of the back taxes. It seems to me, therefore, to be equitable, under all the circumstances, that Slater should be reimbursed the $125 which he paid either directly or indirectly to Gilliam for the deed as a condition for having the tax deed and subsequent conveyances thereunder set aside, and I will sign a decree in this case based upon those considerations.

We are of opinion that the decree of the court below was eminently right and just, and that it should be affirmed, with costs. The cause will be remanded to that court to carry it into effect. And it is so ordered.                    *Affirmed.*